THE STATE OF KANSAS v. JOHN W. JONES.

MURDER — *Competent Expert Testimony.* W. was shot and instantly killed by J. There were but two witnesses to the homicide: one, the defendant, who claimed he acted in self-defense, testified he was only seven or eight feet from W. when he discharged the musket; the other, a ten-year-old son of W., said the defendant was more than seventy feet distant. From the wound causing the death of W. it appeared that the shot entered his body within a space of two inches in diameter, except three or four just outside of such space. At the trial the defendant produced a witness who said he was and had been a gunsmith for thirty years; that he had studied and experimented for years to ascertain how far guns and muskets would carry shot compactly, and that he was able to state how far from the musket used a person receiving such a wound as deceased would have been. *Held,* The witness was qualified as an expert, and the evidence sought to be introduced was competent and material.

*Appeal from Shawnee District Court.*

PROSECUTION for murder in the first degree. From a conviction at the November term, 1885, the defendant *Jones* appeals. The facts are sufficiently stated in the opinion.

*Vance & Campbell,* for appellant.

*S. B. Bradford,* attorney general, and *Charles Curtis,* county attorney, for The State.

Opinion by HOLT, C.: On Sunday morning, September 20, 1885, John W. Jones, the defendant, killed Edward H. White, in Shawnee county. The defendant was tried in November following, in the district court of said county, found guilty by a jury of murder in the first degree, and upon March 31, 1886, the court entered judgment accordingly. Defendant appeals.

The record discloses substantially these facts: Jones was a tenant of White, and there had been some difficulty between them concerning the terms of a lease under which he held, and more especially about the trespassing of White's stock in Jones's garden-patch and cornfield. There had been considerable bad blood, some threats made by both parties, and several altercations between them. Early in the morning in question White missed a heifer from his herd, and went to Jones's house, which was about fifty or sixty rods south of his house, where he found her. Of what occurred after White first met Jones that morning, we have the testimony of the defendant and of Edward White, a ten-year-old son of the deceased. Jones says he was near his stable feeding his horses, and as White passed by after his heifer, he abused him; claimed he was responsible for the heifer getting into the cornfield by not keeping his fences properly repaired, and threatened him; that he said little, if anything, in reply. On the other hand, White's boy states that Jones first called to his father, but that they were so far away from him that he could not understand what was said between them. Both agree that White passed on, found his heifer, and was driving her back to his house. The lad says that the heifer ran out of the road and his father followed her; while Jones states that after driving the heifer past his place he must have turned around and come back to the stable. The testimony in the district court

was evidently given with reference to a plat before the court; that plat is not here, nor a copy of it, but from the record it seems that Jones's stable, near where this man was shot, was four or five rods from his house in a northeast direction, and that the hen-coop hereafter mentioned was south of the house and southwest of the stable. After this talk between White and Jones, while White was hunting after his heifer, Jones went to his house and got his musket, brought it to the stable, and set it outside of the door. Concerning the immediate act of killing, young White states that as his father was following the heifer, Jones ran out and got upon the hen-house, and shot from the roof at his father, who was some distance away. From the testimony of the boy, it appears that the parties must have been at least sixty feet apart, and may have been one hundred. He states that after the defendant had shot, he jumped down off of the hen-house and ran and struck his father two blows with the butt of his musket, after he had fallen. The defendant on the other hand, testifies that he was at work at the stable, and White having driven his heifer past Jones's house toward his own, turned and came back to him at the stable, and the first he knew of his presence was a threat from White; that he immediately stepped around the corner of the stable and got his gun; that White threatened to kill him, and was coming toward him with his hand in his coat pocket, and while he was advancing, and within seven or eight feet of him, he shot him, and, grasping his musket by the barrel, struck him before he fell. The gun-shot wound was in the left side, near the hip bone, and entered his body within a space of two inches, with three or four scattering shots around the edge of the hole; the shot used were double B's. White never spoke after he was hit, and died almost instantly. Some of the threads of the coat of deceased were driven into the wound, and there was some testimony, though not very satisfactory, tending to show that the garments of White were powder-burnt.

At the trial Joel Huntoon, a civil engineer, testified that the defendant upon the day of the homicide fired a musket

from the hen-house to a paper target placed where the deceased was shot; this was produced in court and introduced in evidence, but after all the evidence was in, the court excluded it from the jury. The witness testified that the musket used was similar to the one with which defendant shot deceased; it may have been the same one.

The defendant then offered George B. Palmer and A. J. McLaughlin for the purpose of showing from the nature and size of the wound the approximate distance that Jones must have been from White at the time of the shooting. They were not allowed to testify on that point. The defendant claims that the rejection of this testimony was error. He claims that this is expert testimony; the state denies. McLaughlin testified that he was a manufacturer and trader in breech and muzzle-loading guns; that he was a gunsmith by trade, and had been in the business for thirty years; that he had experimented with guns and muskets such as the one used by defendant; that it had been a study with him and with men in his business to find how guns could be manufactured to throw shot compactly for a distance, and that they tried to manufacture improved guns which would increase the distance they would thus carry a load of shot; that by experiment and study he had obtained a definite and accurate knowledge of how far shot-guns of all kinds would carry without scattering. He further stated that he had sufficient experience to tell from the character of the wound about the distance the gun discharged would be from the person shot; that he had experimented himself and seen others experiment with shot-guns and muskets when loaded with powder and "double B" shot, to see how far they would carry without scattering. He was then asked:

"Q. From such experiment and observation are you able to tell with any degree of accuracy how far such a gun would throw shot without scattering beyond what would be a distance two inches in diameter, with four or five shots just around the edge of the space in diameter? A. I can state the distance within which such a shot would necessarily be made.

"Q. State what the distance would be." [Objected to on

the ground that said question is one of fact for the jury, and not such an one as requires the opinion of an expert; the court sustained the objection, defendant duly excepting.]

Other questions of like character were asked, and the question was fairly presented to the court.

We believe that the evidence sought to be introduced by these questions was competent, and that its rejection was error. It was material testimony in this case; the testimony of Jones, the defendant, and this lad, were upon two theories of the case and were distinctly inconsistent. One had testified that the parties were only seven feet apart at the time of the shooting, while the other had located them from sixty to one hundred feet from each other. It became a matter of vital importance to determine which account of the homicide was truthful — that of the boy, or of the defendant.

One of the important facts to be found by the jury was the distance the defendant and deceased were from each other when the fatal shot was fired. The determination of that disputed question would have in this case very great importance in determining whether the testimony of the boy White or of the defendant should have been given greater credence. If the boy's testimony was true, then the defendant was guilty of murder in the first degree beyond a reasonable doubt; and on the other hand, it is equally plain if the defendant told the truth he certainly was not guilty of that degree of homicide.

If there is any rule known by those who have made the use of firearms a special study, showing at what distance shot could be thrown compactly and at what distance they would scatter, it should have been given to the jury, either as a corroboration or refutation of either the defendant or of the lad White.

The theory of the state is, that this testimony was not expert testimony; that the jury was as competent to determine the distance the parties were apart when deceased was shot as the gunsmith, and cite a long list of authorities to support its contention. We have examined all that have been cited, and believe that no one of them is applicable to this case; they

are all based upon the question of the relative position of the parties to a homicide, showing from what direction the shot was fired, and whether the assailant was at the front, side, or back of the party killed.    None of these authorities reach the question here in dispute.    It is not whether Jones was at the left side of White; that he was on higher ground or lower ground, or that he stood north, south, east, or west of the party killed, but how far was he from him?    If that was a matter that could be determined by an experienced man from the size of the wound, then this testimony would not have been expert testimony.    On this subject Mr. McLaughlin testified that he and others in his trade had made it a study to devise methods for shooting shot a long distance compactly, and that by reason of his study and observation he was able accurately to state how far shot could be thrown from the musket in question.    We are of the opinion that very few men have any definite or accurate idea of the manner and distance shot would scatter when fired from a gun.    Of course, all know that they are discharged in a compact body from the muzzle of the gun, but how far they go before they begin to separate, and the extent, or the relation of the distance from the gun to their separation from each other, is a subject upon which one, without special experience and study, could not even make an intelligent guess; in other words, this is a question of science, to be ascertained by study and experience, and does not come within the common knowledge of men.

We recommend that the case be reversed, and remanded.

By the Court: It is so ordered.

HORTON, C. J., and VALENTINE, J., concurring.

JOHNSTON, J., dissenting.