113  259
131    9

JONATHAN J. LONG, Appellant, v. THE TRAVELLERS INSUR-ANCE COMPANY.

**Evidence:** THAT SHOOTING WAS NOT ACCIDENTAL: *Circumstantial evidence admissible.* In an action on an accident policy it appeared that plaintiff had gone hunting one afternoon out into the country about two miles and back, and that at the time of the injury he was alone, returning the gun to its owner from whom he borrowed it, and that he declared himself unable to detail the circumstances of the shooting save that he had stopped to buckle his overshoe, and then removed, as he sup posed, all the shells from the magazine of the gun, and that, when starting to move on, it went off, injuring his foot. *Held*, that circumstantial evidence was properly admitted to establish the defense of intentional shooting, as defendant must of necessity have wholly relied on it.

JURY QUESTION. In an action on an accident policy, in which plain-tiff claimed to have accidentally shot himself in the foot, on going to return a borrowed gun after his return from a hunting trip of about two miles into the country, it appeared that at the time of the injury he was alone. There was evidence that he had been talking about the trip for weeks prior thereto. He had spoken frequently of indemnity procurable from accident insurance, if just such an event occured, and had intimated "smoothness" on the part of others injured and indemnified. He had mentioned a presentiment and dreams of the loss of his foot, and declared his purpose to load up with insurance on the day in question, as it would be a good thing to fall back on, and he was particular, in obtaining some of the policies, to ascertain what portion of the foot must be removed to entitle him to indemnity. At the time he was insolvent and under pressing need of money to pay insistent creditors. The policy sued on was for $10,000, one-third payable upon the loss of a foot or hand, and was obtained by executing a premium note, six days before the injury, falsely represented to have been signed by his wife as surety. Within an hour before starting

on the trip, he procured eight insurance tickets for $3,000 each, which he supposed, by mistake, contained similar conditions. *Held*, that whether the wound was self-inflicted, was for the jury.

PROOF OF MOTIVE...Evidence tending to show plaintiff's insolvency and that he was in pressing need of money to pay insistent creditors, was rightly received for the purpose of fixing a motive for plaintiff's alleged self-infliction of injuries.

INTENT IN OBTAINING INSURANCE. It was also proper, as evidence of an intention to defraud, to show that defendant had falsely represented that he was going on the road as a collector, and he would be able to pay the premium from his salary; that he falsely represented the premium note to have been signed by his wife as surety, he having imitated her handwriting; that he kept from her the fact of obtaining insurance aggregating $34,000, though accustomed to talk such matters over with her, and that he entertained the agents, while preparing his policies, with stories of others being injured while hunting, and who were indemnified.

DEGREE OF PROOF. In an action on an accident policy defended on the ground that the wound was self-inflicted, an instruction that all the circumstances to warrant such finding must be consistent with such conclusion, and absolutely incompatible with any other reasonable hypothesis, states a rule obtaining only in criminal cases, and was properly refused.

POWDER STAINS: *Materiality.* Plaintiff wore an overshoe over a slipper, and the evidence tended to show that the former had no powder stains, and was split down to the toe, and the theory of the defense was that the muzzle of the gun when discharged was inside the top of the overshoe, and hence must have been voluntarily placed there for that purpose. *Held*, that the distance at which powder stains are caused by firearms was material.

*Subject of expert testimony.* The distance at which powder stains are caused by firearms, and the probable effects of gas generated by the explosion of powder in the discharge of a gun, as dependent on its proximity to the person of one claiming to have been accidentally injured thereby, are subjects of expert evidence.

INSTRUCTIONS ON EXPERT TESTIMONY. An instruction characterizing expert testimony in a case as "made up largely of mere theory and speculation, and which suggests mere possibilities," was properly refused, since it inaccurately defines, and severely criticises such evidence.

Insurance: Representations: *Copying.* Where representations made in obtaining a policy may not properly be included in the application, they may be proven without being endorsed upon the policy.

Pleading: Compelling more definitness in petition: *Harmless error.* One suing on an accident policy, claiming to have accidentally shot himself in the foot with a gun, when alone, was not prejudiced by being required to set out in his petition the particular circumstances under which the injury was received.

Instructions: *Necessity for request.* It was not error to omit special reference to expert and circumstantial evidence introduced, if instructions correctly announcing the law in relation thereto were not requested.

Same. It is not error to refuse a charge that defendant is relying on circumstantial evidence, where the weight of such evidence essential to sustain the defense stated. That the party so relies is as well known to the jury as to the court.

Appeal: Remarks of trial judge: *Exceptions.* If no exception was taken, at the time, to a remark of the court, all objections thereto were waived.

*Appeal from Polk District Court.*—Hon. T. F. Stevenson, Judge..

Tuesday, February 5, 1901.

Action on an accident insurance policy, stipulating for the payment of an indemnity of $10,000 in event of death, and one-third thereof upon the loss of a hand or a foot. The plaintiff lost his left foot as a result of a gunshot wound received in the evening of February 18, 1897, Judgment was entered on a verdict for the defendant, and the plaintiff appeals. —*Affirmed.*

*Ayres, Woodin & Ayres* for appellant.

*Clark & McClaughlin* and *Cummins, Hewitt & Wright* for appellee.

Ladd, J.—The discharge of a gun into plaintiff's left foot at about 7 o'clock in the evening of February 18, 1897,

rendered amputation necessary. During the afternoon he had gone to Valley Junction by street car, hunted out in the the country about two miles and back, and then returned to Des Moines, having killed a rabbit and a crow. At the time of the injury he was alone, returning the gun to its owner, from whom he had borrowed it that morning. The circumstances of the shooting he declared himself unable to detail, save that he had stopped to buckle his overshoe, and then removed, as he supposed, all the shells from the magazine of the gun, and that when starting to move on it went off. This brief summary makes it evident that to establish its defense that the shooting was intentional, and not accidental, the defendant must of necessity have relied wholly on circumstantial evidence. The searchlight of truth must have been turned into plaintiff's mind, and his hidden purposes revealed. The limitations of human nature are such that we can only learn the thought and motives of others through legitimate inferences to be drawn from what they do or say. For this reason, the objection interposed to this class of evidence, stoutly insisted upon by appellant, were properly overruled. The instinct of self-preservation is such that no person, however sordid, will voluntarily mutilate the members of his own body, even for gain, without great hesitation. The whole being recoils in the first instance at such a thought, and it cannot be said in any case to have happened until after brooding over the design for a considerable time, even for days and weeks, and then only in pursuance of a definite plan. It was proper then to introduce evidence tending to show that plaintiff had been talking about this seemingly unimportant hunting trip for weeks previous to the injury; that he had spoken frequently of the indemnity procurable from accident insurance in event of the loss of a hand or a foot in hunting, and had intimated "smoothness" on the part of others injured and indemnified; that he had mentioned a feeling that something was going to happen to him on this trip, and had dreamed of the loss of his foot;

that he declared his purpose to load up on that day with insurance, as it would be a good thing to fall back on; and that he was particular, in obtaining some of the policies, to ascertain what portion of the foot must be removed to entitle him to indemnity. So, too an overpowering motive may be looked for in such a case. Ordinarily, the mere love of money would have little influence in inducing a person, however corrupt, to tear from him a foot or a hand. Even the highwayman and the burglar, ordinarily possessed of a high degree of physical courage, stop short of of this. Evidence was rightly received, then, tending to show his situation in life, and not only his insolvency, but that those who had made loans to him, which he was under special obligations to repay, were demanding restitution. In other words, that he was under pressing need of money had a tendency to fix a motive for inflicting the injury. And when we have added that the policy sued on of $10,000 was obtained by executing a premium note falsely represented to have been signed by his wife as surety but six days before the injury, one-third to be paid on the loss of a foot or hand, and that within an hour before starting for Valley Junction that day he procured eight insurance tickets, of $3,000 each, which he supposed to contain similar conditions, enough has been said to indicate that the question of whether the wound was self-inflicted was solely for the jury's determination.

II. As pointed out, plaintiff's intention in procuring the insurance policies was an important feature of the case; for, if he so did with the purpose of fraudulently obtaining indemnity, this was one of the circumstances constituting the scheme ending in the destruction of the foot. It was proper, then, to receive evidence showing that he had falsely represented that he was going on the road as a collector for some house, and would be able to pay the premium on the policy sued on from his salary at the end of a month; that he falsely represented the premium note to have been signed as surety by his wife, himself imitating her hand-

writing; that he kept from her the fact of obtaining insurance aggregating $34,000 when accustomed to talk such matters over with her; and that he entertained the agents while preparing his policies with stories of others being injured while hunting, and who were indemnified by insurance owing to the accident. As these circumstances might not properly be included in the application, defendant was not prohibited from proving them because of its failure to indorse them on the policy.

III. The plaintiff wore an overshoe over a slipper, and the evidence tended to show that the former had no powder stains, and was split down to the toe. The theory of the defense was that the muzzle of the gun when discharged was inside of the top of the overshoe, and hence must have been voluntarily placed there for that purpose. If not, how came it to escape being powder burned? If in plaintiff's hands, as he declared, and accidentally fired, the muzzle of the gun must have been near the foot. The distance at which powder stains are caused, then, was a material inquiry, and, over plaintiff's objection, C. W. Budd, who was shown to have had much experience in handling firearms, was permitted to testify at what distance the shoe would have been burned, and to explain why the burned space is larger the further off the gun. The appellant insists this was not the subject of the expert evidence. We think otherwise. It may be that most jurors know how to fire a gun; but few, if any of them, have given thought concerning the amount of heat generated by the explosion of powder, or to the relative effect with respect to the distance of the object hit.

IV. What we have just said applies to the objections interposed to the testimony of certain chemists. It is quite generally known that gas is generated by the explosion of powder, but the volume, its explosion pressure, and what will be its manifestation if confined, are matters of scientific knowledge. An important inquiry was whether the rending of the overshoe, slipper and wound to the

foot was caused by the sudden passing of a charge of shot, merely, or in part was the result of the explosion force of gas generated by the discharge of the gun.    If the muzzle had been at some distance, the gas might have in large part escaped in the air.    If under the lap at the top of the over-shoe, it would be somewhat confined, likely to follow the path of least resistance, and might tear the shose and affect the foot.    The probable effects of a discharge in the position mentioned might be readily estimated by a person possessed of scientific knowledge of explosives.    People generally give no attention to such matters, and information of the number of pounds pressure to the square inch as the gas leaves the gun, and that its volume is 2,500 times that of the powder, would furnish no definite idea of the effect when directed at a particular object, far and near, nor of its probable manifestation when somewhat confined.    These matters are not of common knowledge, as contended by appellant.    Only one of special learning or experience with explosions would be able to estimate with any degree of accuracy the effect of a discharge of a gun in the positions suggested, and for this reason there was no error in receiving the opinions of the experts.

V.    The court was not bound to instruct specially upon every class of evidence received, and, unless instructions correctly announcing the law were requested, it was not error to omit special reference to the subject of expert and circumstantial evidence. The one on expert testimony requested characterized it as "made up largely of mere theory and speculation, and which suggests mere possibilities."    It is needless to say that such a definition, inaccurate in point of fact and conveying a severe criticism of such evidence, was properly refused. That defendant relied on circumstantial evidence was quite as well known to the jury as the court, and the weight of such evidence essential to sustain the defense was stated.    It was not error, then, to refuse instructions on these points.    Other instructions requested were to the effect that all the circumstances to warrant a finding that the

wound was self-inflicted must be consistent with such a conclusion, and absolutely incompatible with any other reason-:tble hypothesis. Such a rule obtains in criminal, not civil, cases. In the latter the jurors are not to be freed from all reasonable doubt, but to find for the party in whose favor the evidence preponderates, and according to the reasonable prob-.ability of truth. 1 Greenleaf Evidence, section 13.

VI. Most of the rulings on the admissibility of evi-·dence have been disposed of by what has already been said. 'The others are so manifestly correct that discussion is not demanded. The competency of the experts to testify was established, and no exception taken to the remark of the court complained of. In failing to question :the propriety thereof in some way at the time, all objection thereto was waived. The plaintiff was not prejudiced in being required to set out in his petition the particular circumstances under which the injury was re-·ceived. The motion to strike the amendment to the abstract is overruled. A careful examination of the entire record has ·discovered no prejudicial error, and the judgment is AF-.FIRMED.