STATE OF IOWA, Appellee, v. LEM JOHNS, Appellant.

Criminal law: MURDER: EVIDENCE. On this prosecution for murder in the first degree the evidence is reviewed and held sufficient to support a conviction for manslaughter.

Same: EXAMINATION OF WITNESSES: ARGUMENT: DISCRETION. The scope of cross-examination in a criminal case and the argument of counsel are matters largely within the discretion of the trial court, and in the absence of an abuse of that discretion a reversal will not be ordered on these grounds.

Same: EVIDENCE: FLIGHT. On a prosecution for murder a qualified physician, under a plea of self-defense, may testify that the indications were that the gun with which deceased was shot was held close to the body.

Flight of accused may also be shown as a circumstance bearing upon his guilt.

Same: APPLICABILITY OF INSTRUCTIONS. Where there was no evidence tending to contradict the dying declarations of deceased

a requested instruction that inconsistent statements might be considered to impeach his dying declarations was properly refused.

**Same:** INSTRUCTIONS: WEIGHT TO BE GIVEN DYING DECLARATIONS. Failure to instruct that a decedent's intoxicated condition at the time of making dying declarations should be considered in determining the weight to be given the declarations does not relate to a matter so inhering in the question of guilt or innocence as to constitute reversible error, in the absence of a request therefor.

**Same:** INSTRUCTIONS: SELF-DEFENSE: ASSAULT. Where the instructions given with reference to self-defense are full and complete the refusal of requested instructions on the subject is proper. Refusal to submit different assaults necessarily involved in a charge of murder is also proper.

**Same:** INSTRUCTIONS: DYING DECLARATIONS. The instructions in this case with reference to dying declarations and their consideration by the jury are a correct application of the general rule to the facts of the case.

*Appeal from Appanoose District Court.*—Hon. D. M. Anderson, Judge.

Tuesday, October 17, 1911.

Defendant was indicted for the crime of murder in the first degree. Upon trial he was convicted of manslaughter and from the judgment imposed he appeals. *Affirmed.*

*Howell & Elgin,* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

Deemer, J.—Defendant admitted on the witness stand, and his counsel admitted in the argument before us, that he, defendant, shot and killed the deceased, John Tharp, at or about the time charged in the indictment, but it is strenuously insisted that the killing was in self-defense.

That issue was submitted to the jury, and the verdict, while negativing defendant's contention in this respect, is such as to acquit him of the crime of murder in either degree. Something like eleven points or propositions are relied upon for a reversal; but we need not consider each, for many are so fully covered by previous decisions as to be beyond the pale of reasonable discussion.

I.   Defendant is the stepson of the deceased, and at the time of the killing was not quite sixteen years of age. Until two or three weeks before the homicide, defendant had lived with his mother and stepfather, but, as was his custom, during the spring and summer season he had gone into the country to work, and had not lived with Tharp for some weeks prior to the shooting. The day before the fatal encounter he had come in from the country, and was visiting at the home of a Mrs. Bonnie Starr. Tharp had married defendant's mother in January of the year 1910, and the shooting occurred on April 23 of the same year. Defendant's father died some years prior to his mother's marriage to the deceased; and it appears that his mother either through her first husband or by her own efforts acquired the title to some property in the town of Moulton. This property she deeded to defendant and his sister some years before her marriage to Tharp. It seems that Tharp was dissatisfied with this conveyance, and that he was insisting, after his marriage to Mrs. Johns, that the property should be reconveyed to her. On Saturday evening, April 23, 1910, Mr. and Mrs. Tharp had gone to their home for the purpose of packing their household effects in order to move them to the residence of Tharp's father, where they were expecting to make their home. They remained there but a short time, and were returning to the home of the elder Tharp, when they met the defendant and his sister, Mrs. Starr, near a store building in the town of Moulton. Shortly after passing each other,

*1. CRIMINAL LAW: murder: evidence.*

Tharp called to defendant, saying, "Lem, wait a minute. Your mother wants to speak to you." To this defendant responded, saying, "I don't care to talk to my mother." What occurred from this time down to the shooting is a matter of sharp dispute. Defendant's version of the matter is as follows:

I saw nothing more of Tharp until I saw him standing in the darkness at the side of Wood's store. I did not want to meet Tharp. We stopped at Wood's store. Bonnie went inside, but I didn't. I was outside there by the door, where the vestibule is. Wood's store was lighted up. It was close to eight o'clock. I waited until my sister came out. Then we started around the corner towards home. You couldn't see any distance to recognize anybody. When we first came around the corner, I did not see anything of Tharp standing there. It was dark. It was between a snow and a sleet if I can remember right. It was cloudy. It was fifty or sixty feet from the corner I should judge when I came to John Tharp. When I came to John Tharp, I was walking. Mr. Tharp was standing there. We passed them. We passed I should judge ten or fifteen feet. Just before we passed, John Tharp changed his position. He was standing against the building, and he stepped out against the walk, facing the building, so that we had to pass between him and the building. As we went by, I spoke to my mother. Tharp says, 'Stop, come back here.' He said it like he was angry. From the tone of his voice it did not seem like he felt any better toward me than he had felt. I did not want any trouble with him. I obeyed him, and finally stopped. I says, 'What do you want?' Mr. Tharp said, 'Your mother wants to talk to you.' I finally stopped. He started towards me. There was no other witness there except my mother and sister and myself. I did not see anyone down in the cellar. . . . When Mr. Tharp first got in reach of me, he grabbed me by the shoulder, and I couldn't turn round. Finally I turned around. I got loose. Then he grabbed me by the throat, and pushed me up against the brick building. He pressed me severe and hard. My head went up against the brick building. I didn't make any signs or speak any words while he had my head

against the brick building, because he was choking me,
and I couldn't speak. It felt like he was choking me,
like he was shutting off my wind. It felt like if it kept
on very long that he would take my life. I tried to get
loose. I felt like he was larger and stronger than I was.
When the shot came, he was still choking me against the
side of the building. When he commenced choking me,
he struck me. He says, 'God-damn you, I will fix you
now.' Right at that time he shoved his hand down quick
toward his pocket. I saw the quick motion in a general
way. As to whether he actually put his hand in his
pocket I couldn't say. I thought he was going down into
his pocket for something when he said, 'God-damn you, I
will fix you.' That was my conviction. When he said
that, I understood my sister to say, 'Don't shoot him with
that.' She mentioned John Tharp's name. She said,
'John Tharp, don't you shoot him with that.' That is
what I thought she said. That made me think still fur-
ther that he had some kind of a weapon that he was going
to hurt me with. I was honest in that, and believed he
was going to do something of that kind with the weapon.
I believed it still more when I heard Bonnie make that
remark. I saw the motion Bonnie made trying to protect
me with her hands. About the time he said, 'God-damn
you, I will fix you,' I brought something out of my pocket
and shot it off. I did not point it at him or at any par-
ticular place. I thought it was necessary to protect my-
self. I thought my life was in danger. I did not know
where I had hit him, or that I had hit him at all. I did
not try to shoot twice. I did not have any thought of
shooting even once any more than to protect myself. After
the shot went off, his grip released. I didn't see him
make any further effort to bring his arm up. After I
got loose, I got away as quick as I could. I was anxious
to get away from his presence. My mother did not say,
'Don't shoot him any more.' I did not hit Tharp at all.
After he let loose, I left right off. I didn't see what
motion he went through with my mother. I went west.
I had not been in the habit of carrying a revolver. I had
seen Tharp carrying a gun and have a gun in his pocket
when he would come in and when he went out before these
threats came up. I believed at the time we had this

trouble that he was in the habit of carrying a gun. I believed he had a gun in his pocket · from all that took place before. The revolver I took to have fixed was my brother-in-law's. I left it to be fixed at Mr. Starr's request. . . . If I had thought that John Tharp had been waiting around there in the dark at the side of Wood's store, I would not have gone around that way. When Tharp approached me and commenced talking to me, I noticed he was drinking. I thought he had been drinking by the way he acted. I could detect the liquor on his breath. I had heard that he was quarrelsome while drinking. . . . A. He came up. He came up when I stopped there. When he choked me, he looked mad and heated from what I could see. I would not have taken out the gun and pulled the trigger but for the fact that I thought it was necessary to preserve my life. I had no reason to follow him and shoot him except to save my life when he approached me.

The story was corroborated with some departures by defendant's sister, Mrs. Starr; but the mother, although an eyewitness, was not called by either side. Against this the state introduced a purported dying declaration made by Tharp, from which we quote the following:

Mr. Tharp said that he and his wife had been down to their little house where they had been living, packing up their goods preparatory to moving them over to his father's house, where he and his father had been living before; that they worked awhile, and got cold without any fire, and concluded they would go back home, and in doing so they went by way of town, and he said: 'We came up along the side of Wood's store, Elmer Woods Company's store, and met a man and a woman, and, just after we passed, I said, 'Lem, wait a minute, your mother wants to speak to you,' and Lem said, 'I don't care to talk to my mother,' and at that moment they turned facing each other, and Lem hit him and immediately shot him; that he himself didn't strike the boy or didn't touch him in any way. . . . His version was that he and his wife had been down to her house; that is, where they had been theretofore living. They were down to her house

packing up preparatory to moving up to the old man Tharp's. I am clear as to that. They had been down to her house packing preparatory to moving, and he said he got cold down there, and they thought they would go back home. He said he didn't have any fire. . . . He spoke to him, and said, 'Lem————.' They had just passed each other. At the time he hollered at Lem, Lem had already passed. In his dying statement he says, 'I didn't touch him.' He said he never touched him. He said that after he stopped Lem, after Lem had already passed. In his dying statement he says, 'I didn't touch him.' He said he never touched him. He said that after he stopped Lem, after Lem had gotten by, that Lem said, in substance, that he didn't care to come back and talk. He said that. He didn't tell me how it came that he finally got Lem back there in conversation. He didn't tell me anything that Lem hit him with. He didn't say whether Bonnie hit him or kicked him at the time that the old lady, Mrs. Tharp, hollered.

Another witness to the dying declaration testified as follows: "He says, 'I am done for.' He said, 'The kid had shot him.' I don't remember just who it was that asked him who it was, it seems to me that it was me that asked him who it was, who the 'kid' was, and he said it was Lem Johns. He said, 'We started down to her house, and it was pretty cold, and we got as far as William Wood's house, and she said, it is too cold to go down there; let's go back. And we turned around and started back, and met Lem and Bonnie, and I said to Lem, your mother wants to speak to you, and Lem says, I won't talk to her. I says, yes, you will; she wants to talk to you, and he said, no, I wouldn't talk to her, and then is when he hit me and shot me.'" Claim is made that the trial court erred in admitting these declarations in evidence, but the record so clearly justifies the ruling that we shall not take time to discuss the matter further.

In addition to these dying declarations, there was testimony for the state showing a declaration made by

defendant's mother, which was a part of the *res gestae,* as follows: "My God, Lem, you have shot John." Other testimony tended to show that there was no quarrel between the parties, that the ·deceased was not armed, and that immediately upon the shooting defendant fled, and could not be found until the next morning, although diligent search was made for him. It is also conceded that defendant armed himself, that he disapproved of the marriage of his mother to Tharp, and had an extreme hatred for the deceased.

Upon such a record the case was clearly for a jury, and with its verdict we should not interfere.

II. Complaint is made of the cross-examination of the defendant and of his witnesses. These matters are necessarily within the discretion of the trial court, and we see no such abuse thereof in this case as would justify a reversal. The same observation may be made regarding the complaints of the closing argument for the state. These complaints are lodged against statements which were in answer to the argument made for the defendant. Some of these were overheated and of doubtful propriety, but we see no justifiable reason for reversing the case on these grounds. *State v. Thomas,* 135 Iowa, 717; *State v. McIntire,* 89 Iowa, 139.

2. SAME: examination of witnesses: argument: discretion.

III. A doctor who was shown to have the necessary qualifications was asked this question: "What were the indications, Doctor, as to the weapon being close to the body or a distance from it at the time the shooting was done or the shot was fired?" And the record shows the following objections and the answer: (Objected to as incompetent. Objections overruled and duly excepted.) "Well, the indications were that it was close to the body." In this there was no error. *State v. Nowells,* 135 Iowa, 53; *Scott v. Homesteaders,* 149 Iowa, 541.

3. SAME: evidence: flight.

Evidence tending to show flight of the accused was properly received. *State v. Poe,* 123 Iowa, 118.

IV.   The trial court gave the following instruction with reference to dying declarations:

(27) If you find by the evidence and beyond a reasonable doubt that at the office of Dr. Downing, in Moulton, Iowa, on the night of April 23, 1910, that the decedent, John Tharp, was in a dying condition, that he was suffering from a mortal wound which upon that night had been inflicted upon him, and that he was at the time fully conscious that he was suffering from a mortal wound and was in a dying condition, and that he then and there made the declarations and statements attributed to him by various witnesses upon the witness stand before you, and that such declarations and statements were then and there made by said John Tharp under solemn conviction of impending dissolution, and that they were made relative to the encounter between him and the defendant, in which encounter he received a mortal wound, then you are instructed that you should consider such declarations and statements as testimony in the case, and give them the same weight, and weigh and consider them by the same rules, as though made by John Tharp in person on the witness stand under oath before you.

This was followed by instructions with reference to impeachment, reading in this wise:

(28) A witness may be impeached by showing that his general moral character in the community in which he resides is bad.   In this case an effort has been made so to impeach John Tharp.   You will not consider this evidence unless you consider the alleged dying declarations and statements of John Tharp as explained in the preceding instructions.   If you consider such declarations and statements as the dying declarations and statements of John Tharp relative to the encounter which resulted in his death, then you will consider the evidence offered to impeach him relative to his general moral character in the community in which he resided.

(29) A witness may also be impeached by showing

that he has made statements at other times at variance with and contradictory to his testimony upon the witness stand in open court. An effort has been made so to impeach the witnesses Bonnie Starr and F. M. Ellerton, who have testified upon the witness stand in this case. If you find that John Tharp has been successfully impeached by reason of bad moral character in the community in which he resided, or either or both of the witnesses, Bonnie Starr and F. M. Ellerton, have been successfully impeached by showing that they have made contrary statements out of court at variance with and contrary to their testimony upon the witness stand before you, then you are instructed that you are at liberty to disregard the testimony of the witness or witnesses whom you may find impeached, but are not bound to so disregard their testimony, and should not do so where you find it corroborated by other facts and circumstances proved on the trial.

These are complained of because the court did not instruct that inconsistent statements made by John Tharp might also be considered for the purpose of impeaching his dying declarations. The difficulty with this contention is that there is no testimony of any such contradictory statements. As applied to the facts disclosed by the record, these instructions were clearly correct.

4. SAME: applicability of instructions.

Defendant claimed that deceased was under the influence of intoxicating liquor, not only at the time of the shooting, but also at the time he made his dying declarations, and that the trial court should have told the jury to take his condition in this respect into account in weighing his declarations. The difficulty here is that defendant did not ask such an instruction, and the point seems to be made for the first time in this court. The trial court did instruct generally as to the weight and credit to be given to the testimony of each and every witness, and an instruction such as defendant now insists should have been given does not so inhere in the question of guilt or inno-

5. SAME: instructions: weight to be given dying declarations.

cence that failure to give it, in the absence of a request, constitutes reversible error. *State v. Brandenberger,* 151 Iowa, 197. The instructions with reference to self-defense were full and adequate, and the trial court did not err in refusing to give those requested by the defendant.

There was no error in refusing to submit the different assaults necessarily included in the charge 6. SAME: instructions: self-defense: assault. of murder. *State v. Luther,* 150 Iowa, 158, and cases cited. Nowhere in the instructions did the court instruct that defendant was the assailant, as contended by counsel.

This general instruction was given:

(26) What have been termed the dying declarations or statements of John Tharp relative to the shooting have been admitted in evidence, and are now before the jury. Whether these declarations or statements will be considered by you in arriving at your verdict is for the jury to say. Under the law of this state when a mortal wound is inflicted upon one person by another, the person assailed may make a declaration or statement relative to the encounter in which the wound is inflicted, and which statement may be used in evidence upon the trial of the person accused of inflicting the mortal wound, provided the person making such declaration or statement was actually dying or suffering from a mortal wound, that he was fully conscious of such fact, and that the declaration or statement was made under solemn conviction of impending dissolution.

It is abstract in terms, and was followed by No. 27, already quoted, which applied the general rule to the facts of this case. Manifestly there was no error here. Defendant was ably defended in the court 7. SAME: instructions: dying declarations. below, and every possible question has been raised in his behalf on this appeal. An examination of the record satisfies us, however, that the verdict has sufficient support, and that no such errors were committed as to in any manner prejudice the case to his detriment.

The result is that the judgment must be, and it is, *affirmed.*