STATE OF IOWA, appellee, v. CHARLES JILES, appellant.

No. 51763.

(Reported in 142 N.W.2d 451)

1326

May 3, 1966.

Joe Nutting and W. David Tyler, both of Waterloo, for appellant.

Lawrence F. Scalise, Attorney General, Don R. Bennett, Assistant Attorney General, and D. Quinn Martin, of Waterloo, County Attorney, for appellee.

RAWLINGS, J.—Defendant-appellant, Charles Jiles, was indicted for murder in the first degree for the killing of his uncle Booker Hinton.

Trial resulted in a verdict of murder in the second degree and appeal followed.

The fatal shot was fired in a home occupied by defendant and his mother. Present at time of the shooting was defendant's blind mother Minnie Hess, and Louise Hood, a former wife of decedent Hinton.

Defendant arrived home about 9 p.m., October 18, 1964, drank some wine, talked to his mother and Mrs. Hood, and shortly after midnight had a long-distance telephone conversation with his girl friend then visiting in Michigan. The mother interrupted on an extension phone voicing some complaint about cost of the call.

As a result of this intrusion defendant and his mother engaged in a heated argument.

The mother started singing and praying, then finally called Hinton, her brother, requesting he come and take her to the home of a cousin to stay for the night.

When Hinton arrived Mrs. Hess was waiting outside the home, having been taken there by Mrs. Hood. Defendant was standing in the doorway. Hinton got out of his car, walked up on the porch and started arguing with defendant. During the course of this argument Hinton pulled a .45 caliber revolver from his clothing and struck defendant with it. The pistol was then knocked from Hinton's hand and it fell to the kitchen floor. There was a scramble for the weapon but defendant reached it first and the two men then began scuffling. There was a shot fired from the pistol which went into the kitchen floor. The scuffling continued and the men finally moved from the kitchen into the living room.

Defendant then swung Hinton against the wall and said, "this is it", and fired. That statement is denied by defendant.

In any event the bullet struck Hinton in the abdomen. He then went to his car, drove a block away, and was from there taken to a hospital by another relative. He died on the operating table.

Defendant contends his conviction cannot stand because of error by the trial court in the following: (1) Permitting presentation of nonsimilated opinion evidence by an expert witness;

(2) the giving of certain instructions relative to malice; and (3) failing to instruct as to the meaning of presumption or inference, and on the right of defendant to arm himself. We find no reversible error in any of these particulars.

I. Warren G. Johnson, special agent with the Federal Bureau of Investigation, was called to testify for the State.

Defendant does not challenge the competency or qualifications of this witness. He claims opinion evidence by an expert witness must be foundationed upon experiments made with conditions shown to be the same as those existing at time of the controverted event.

The witness Johnson's testimony was confined to laboratory inspections, tests and experiments involving Hinton's trousers, shirt and jacket, the revolver in question and four shells, three of which had been fired, and his knowledge as a ballistic expert.

Defendant appears to direct his most vigorous challenge to admissibility of opinion testimony by this witness as it relates to distance from pistol to person when the fatal shot was fired.

In that connection some of the illustrative questions and answers are as follows:

"Q. I would next like to have you examine State's Exhibit —that is the blue shirt there. A. State's Exhibit 'N'.

"Q. Yes. Would you first identify whether you examined State's Exhibit 'N'? A. I did.

"Q. What tests did you do on State's Exhibit 'N' and what were the results? A. I examined the shirt microscopically for the gunpowder and gunpowder residues.

"Q. Then what? A. I then processed this shirt chemically for the purpose of finding gunpowder. The microscopic examination filed [sic] to show a gunpowder or gunpowder residues. The chemical examination disclosed a small amount of powder residue immediately surrounding the hole in the shirt.

"Q. In the course of firing a weapon or specifically the course of firing State's Exhibit 'O', which is the pistol in this case, can you state whether or not a bullet fired from State's Exhibit 'O' will carry with it any part of the powder on the bullet itself? A. Yes, sir, it will.

"Q. Powder residues deposited around the bullet hole on

State's Exhibit 'N' other than immediately around the hole would have to come from where? A. The powder residue other than that immediately around the hole would have to come from the barrel of the weapon.

"Q. Would you indicate whether your examination of State's Exhibit 'N', the shirt, indicated such powder residues? A. I found no powder residues surrounding this hole other than the immediate area of the hole itself.

"Q. During your examination of State's Exhibit 'N', which is the shirt, do you have an opinion as to how far from the shirt, State's Exhibit 'O' would have had to have been held at the time of firing the shot which produced the hole in State's Exhibit 'N'? A. Yes, sir.

"Q. Would you state what that opinion is? A. The absence of a significant pattern of gunpowder residues surrounding a bullet hole precludes the stating of an actual distance at which the weapon was held from the garment.

"Q. Would you have an opinion as to what the minimum distance from the garment, State's Exhibit 'N', the shirt—what minimum distance there would. be between the shirt and the gun, State's Exhibit 'O', this distance would normally be? A. Yes.

"Q. Would you state what that opinion is? A. This distance would normally be three to four feet.

"Q. Would this have been minimum or the maximum distance that the gun would be from the shirt? A. This would have been the maximum distance, the muzzle to garment, three to four feet.

"Q. Maximum distance? A. The gunpowder particles would appear on the garment; beyond three to four feet they would not appear."

Based upon the scientific experiments disclosed by this testimony, the witness Johnson concluded the weapon had been held a distance of at least three or four feet from Booker Hinton when the fatal shot was fired.

Then, as the result of other scientifically proper tests, he was also of the opinion the shot fired into the body of Hinton

came from the subject revolver. His testimony in that area was as follows:

"Q. Would you examine State's Exhibit 'T' and indicate whether or not you have seen it before? A. Yes, sir, I have.

"Q. Would you indicate what it is? A. This is a .45 caliber bullet manufactured by Remington or Peters.

"Q. And what tests or test, what examination did you make of this bullet? A. I examined the bullet to determine whether or not it was capable of being fired in a weapon like State's Exhibit 'O', whether there were sufficient marks on this bullet to identify a specific weapon from which it was fired.

"Q. And what were the results of your tests? A. I test-fired State's Exhibit 'O', I recovered the bullet and microscopically compared the bullet with State's Exhibit 'T'. This was done with a comparison microscope which is two lenses instead of a single one so that you look down and see on one side the evidence bullet and on the other side the test bullet that you fired in the laboratory, then by moving the two bullets around simultaneously you get an actual side-by-side comparison of the marks.

"Q. What did this reveal as to State's Exhibit 'T' as the bullets showed? A. In my opinion this bullet was fired by State's Exhibit 'O' to the exclusion of all other weapons."

█ In the landmark case of Grismore v. Consolidated Products Co., 232 Iowa 328, 342, 5 N.W.2d 646, we said: "The courts and other authorities uniformly agree that the receipt of opinion evidence, whether lay or expert, and the extent to which it will be received in any particular case, are matters resting largely in the administrative discretion of the court. 32 C. J. S. 86, section 449; 1 Wigmore on Evidence, 2d Ed., 1092, section 682. Courts should be, and are, very loathe to interfere with such discretion unless it has been manifestly abused to the prejudice of the complaining party. We have permitted opinion testimony in many cases on matters with which jurors might have some familiarity, but where the witness, because of his greater knowledge, experience, and familiarity with the subject, might be of help to them."

█ In the same case we said at pages 343, 344 of the Iowa

Reports, supra: "There are many matters of scientific investigation and specialized knowledge in the fields of the professions, trades, business, industry, art, and other endeavors, where the minds of those not learned therein necessarily grope but blindly. Expert opinion in such cases is indispensable to aid the jurors in reaching a correct conclusion, and the fact that the matter inquired about is a vital and controlling fact in the trial, or is even the ultimate fact which the jury are to pass upon and determine, is no reason why the opinion should not be received."

As is indicated in State v. Miller, 254 Iowa 545, 117 N.W.2d 447, Iowa may have encountered some difficulty in arriving at the rule announced in Grismore v. Consolidated Products Co., supra, but now stands committed to the doctrine that expert testimony is admissible as to the cause which produced, probably produced or might have produced a certain physical condition or result, provided, however, no witness should be permitted to give his opinion directly that a person is guilty or innocent, or is criminally responsible or irresponsible, as these are mixed questions of law and fact and not subjects of opinion testimony.

In the case now before us an opinion as to minimum distance the revolver was held from decedent Hinton at the time the fatal shot was fired, was a matter reasonably within the realm of competent expert evidence and would certainly aid the jury in arriving at its ultimate conclusion. The same is true as to conclusions reached upon the basis of ballistic tests conducted.

In support of the foregoing see also Smith v. Cedar Rapids Country Club, 255 Iowa 1199, 1210, 124 N.W.2d 557; State v. Campbell, 213 Iowa 677, 239 N.W. 715; State v. Johns, 152 Iowa 383, 132 N.W. 832; State v. Nowells, 135 Iowa 53, 109 N.W. 1016; Long v. Travellers Insurance Co., 113 Iowa 259, 85 N.W. 24; State v. Cater, 100 Iowa 501, 69 N.W. 880; Straughn v. State, 270 Ala. 229, 121 So.2d 883; Pipher v. State, 144 Tex. Cr. Rep. 238, 162 S.W.2d 101; State v. Smith, 231 La. 649, 92 So.2d 569; State v. Jones, 41 Kan. 309, 21 P. 265; Underhill's Criminal Evidence, Fifth Ed., sections 314–317, pages 792–805; 23 C. J. S., Criminal Law, section 868, page 426; and 20 Am. Jur., Evidence, sections 887–889, pages 746, 747.

■ Subject to certain rather well defined limitations, there is no logical basis upon which to prohibit the presentation of opinion evidence by qualified persons based upon generally acceptable and scientifically established facts, or of post-event experiments conducted under conditions which are shown to be the same as or reasonably similar to those existing at the time and place of such event.

We are satisfied there was no abuse of discretion by the trial court in permitting this F. B. I. agent to voice his opinions and conclusions based upon experience, knowledge and experiments clearly shown to be acceptable and proper under the circumstances.

II. Defendant also voices objection to the court's instructions going to the element of malice involved in the crime of murder.

Instruction 9 stated, in part, murder perpetrated deliberately, premeditatedly and willfully *constitutes murder in the first degree*, and deliberation and premeditation may be established by circumstantial as well as by direct evidence.

This instruction then concluded with the statement that use of a deadly weapon, with opportunity to deliberate, is *evidence* of malice, deliberation, premeditation and intent to kill.

The main thrust of defendant's challenge is seemingly directed to this concluding statement. It is apparently his contention the court should have said use of a deadly weapon creates an inference rather than being evidence of malice.

Inferentially then, defendant concedes use of a deadly weapon creates an inference or presumption of malice and intent to kill. He argues use of a deadly weapon cannot constitute evidence of these elements.

In this connection he also apparently contends that where there is competent evidence in a case rebutting a presumption the parties are back where they started, which may be correct in theory but usually answers little in actual practice.

This is the so-called "dissipation concept", also sometimes classified as the Wigmore-Thayer Doctrine. Defendant claims it has been adopted by this court. However, he does not argue

the point at any length and it is neither necessary nor do we propose to now unduly belabor the matter.

██ ██ For the moment it should be sufficient to simply note that in State v. Fischer, 245 Iowa 170, 172, 173, 60 N.W. 2d 105, we said: "* * * assault with a deadly weapon implies malice; and if death ensues the presumption is warranted that such killing was with malice aforethought, unless there be an explanation to the contrary showing a legal excuse for the assault and killing. Thus, a showing of self-defense might remove the presumption of malice. But *ordinarily*, and certainly under the facts in this case, *the question whether a legal justification is shown is for the jury. * * *.*" (Emphasis supplied.)

See also State v. Whitbeck, 145 Iowa 29, 37, 123 N.W. 982, and Underhill's Criminal Evidence, Fifth Ed., section 642, pages 1529, 1530.

III. Over an extended period of time we have, perhaps rather loosely, employed the terms inference, presumption and evidence interchangeably.

In State v. Ostrander, 18 Iowa 435, 456, this court held, from the use of a deadly weapon, the law presumes a criminal intent.

State v. Zeibart, 40 Iowa 169, 174, then declared as follows: "* * * the law implies malice from the mere fact of the killing, and it devolves upon the defendant to rebut the presumption in order to reduce the offense from murder to manslaughter: * * *.

"* * * the use of a deadly weapon is evidence of malice aforethought: * * *."

Then in State v. Townsend, 66 Iowa 741, 746, 24 N.W. 535, we said: "The court instructed the jury that malice 'is proved by the selection and use of a deadly weapon, in a deadly manner, without legal excuse.' The giving of this instruction is assigned as error. The court probably meant that the selection and use of a deadly weapon, in a deadly manner, without legal excuse, is evidence of malice. But the evidence is not conclusive. It merely raises a presumption, and the presumption may be rebutted. It is hardly proper, then, to say that malice is *proved* by such evidence. Whatever is proved in a case may be regarded

as established. In using the word 'proved' as expressive of the result of such evidence, we think that the court erred."

Later, in the case of State v. Hockett, 70 Iowa 442, 450, 30 N.W. 742, we sanctioned an instruction to the effect that when one assaults another with a deadly weapon likely to produce death, the law presumes malice in the absence of evidence, either direct or circumstantial, to the contrary.

And in State v. Hayden, 131 Iowa 1, 8, 107 N.W. 929, this court said it was proper to instruct in part as follows: " 'The selection and use of a deadly weapon, such as a revolver, in a deadly manner, without legal excuse, raises a presumption and is evidence of malice.' * * *."

Continuing the court then said: "Of course, we do not mean to say that a jury should ever be instructed that the burden is upon a defendant to show want of malice. We use the above expression for want of a better term in which to convey the thought. What we mean is that an unexplained killing with a deadly weapon is evidence of malice, and that the burden is on the accused in that sense that he must make proof of legal excuse, justification, or extenuation, or take the risk of a conviction upon the presumption or inference of malice. * * *."

Thereafter this court stated on several occasions, use of a deadly weapon with opportunity to deliberate is evidence of malice and intent to kill. See State v. Kelley, 253 Iowa 1314, 1322, 1323, 115 N.W.2d 184; State v. Jackson, 251 Iowa 537, 545, 101 N.W.2d 731; State v. Nutter, 248 Iowa 772, 778, 81 N.W.2d 20; State v. Christie, 243 Iowa 1199, 1207, 53 N.W.2d 887; State v. Crutcher, 231 Iowa 418, 423, 1 N.W.2d 195; and State v. Heinz, 223 Iowa 1241, 1258, 1259, 275 N.W. 10, 114 A. L. R. 959.

However, Stenberg v. Buckley, 245 Iowa 622, 626, 627, 61 N.W.2d 452, discloses strict lines of distinction between presumptions of fact and inferences were abandoned when we said as follows:

"What are commonly known as 'presumptions of fact' are really not presumptions at all, but inferences. '* * * a "presumption of fact", in the loose sense, is merely an improper term for the rational potency, or probative value, of the evidentiary

fact * * *.' IX Wigmore on Evidence, Third Ed., 288, section 2491. Greenleaf on Evidence, 144, section 44, says: 'They are, in truth, but mere arguments, * * *' and '* * * depend upon their own natural force and efficacy in generating belief or conviction in the mind * * *.'

"These inferences do not affect the duty of either party to produce evidence, except as each party is desirous of showing whatever he can to aid his case. Whether an inference of fact, a 'presumption of fact in the loose sense' as Dean Wigmore describes it, aids a litigant, depends upon whether the common knowledge and experience of men, as applied to facts shown, lead to the belief that ordinarily and usually further facts or consequences follow. Such an inference is a reasoning process, an inferring from other facts which appear in evidence. The presumption of innocence which clothes a defendant in a criminal case is one raised by the law, and is a real presumption; but when it is said, for instance, that when a certain state of things or affairs is shown to have existed at a given time, its continuance is presumed, what is really meant is that the showing of the existence at a specified time is admissible as evidence of the continued existence. It is of course a rebuttable inference. Whether any inference is to be drawn from a given set of facts depends upon whether the state of affairs to be inferred usually and generally follows from the facts shown." See also State v. Hartwick, 228 Iowa 245, 251, 290 N.W. 523, and 2 South Dakota Law Review 76.

While a presumption of fact or inference is not generally considered as evidence, it does cast upon the party against whom invoked the burden of going forward with the evidence. Beggs v. Metropolitan Life Ins. Co., 219 Iowa 24, 26, 257 N.W. 445, 95 A. L. R. 863.

On the other hand, there is some authority supporting the view that when an inference has been created it, in effect, is evidence in the sense that it may suffice to carry a case to the jury. Jones Commentaries on Evidence, Second Ed., section 30, and Jones on Evidence, Fifth Ed., section 117.

Be that as it may, instruction 9, which defendant challenges, did not say malice is *proved* by use of a deadly weapon which causes death of a person.

Neither did it nor other instruction serve to place any burden of proof upon defendant.

IV. In addition to this, we have repeatedly stated instructions must be considered as a whole and all applicable law is not to be found in any one. State v. Ebelsheiser, 242 Iowa 49, 57, 43 N.W.2d 706, 19 A. L. R.2d 865. In the case now before us the court by instruction 27 so advised the jury.

Looking then to instruction 5, we find the trial court gave to the jury these clear and understandable definitions:

" 'Malice' is that condition of the mind which prompts one to do a wrongful act intentionally, without just cause or excuse, and in wanton disregard for the rights and safety of others. Malice may be either express or implied. It may not be implied where there is adequate provocation.

" 'Express malice' is that which is established by proof of spite, hatred, or ill will, or by proof of a deliberate or a fixed intent to do injury.

" 'Implied malice' is that which may be *inferred* from the acts and conduct of the accused, and the means employed by him in doing the wrongful and injurious act without just cause or excuse. Malice is not mere spite or hatred or ill will, and *malice may not be implied where there is adequate provocation. * * *."* (Emphasis supplied.)

See in this connection State v. Leedom, 247 Iowa 911, 916, 917, 76 N.W.2d 773.

By instruction 7 the court properly instructed as to the meaning of malice aforethought.

Following this, instruction 11 stated as follows:

"The intent with which an act is done, being a mental state or condition of the mind, is seldom, if ever, capable of direct and positive proof; but is to be arrived at by such just and reasonable deductions or inferences from the acts and facts proved as the guarded judgment of a candid and cautious person would ordinarily draw therefrom.

"In determining the intent of any person, you have a right to infer that he intended to do that which he voluntarily did, and that he intended the probable and natural consequences to

follow his acts, voluntarily done, which ordinarily follow such acts."

Murder in the second degree was defined by instruction 12 with the admonition that before there could be a conviction on this included offense, the State must have proved beyond a reasonable doubt four essential elements, to-wit: The shooting of Hinton by Jiles; death of Hinton as a result of being so shot; the shooting was done with malice aforethought; and the killing was not done by Jiles in self-defense, or by accident.

Then by instructions 15 and 16 the jury was properly advised as to self-defense and accident.

When these instructions are harmonized and appropriately considered together, we see no reversible error.

In substance and effect the court here told the jury: Malice may be inferred from the acts and conduct of a person; intent is a state of mind to be determined by reasonable deductions and inferences; the jury may infer a person intends the natural consequences of an act voluntarily done; and use of a deadly weapon with opportunity to deliberate is evidence of malice, deliberation, premeditation and intent to kill, unless the defendant acted in self-defense or the shooting resulted from an accident. See in this connection State v. Crutcher, 231 Iowa 418, 423, 424, 1 N.W.2d 195.

This does not mean instruction 9 is looked upon with favor or should be used as a pattern. Rather we are simply persuaded it was not prejudicially erroneous under existing circumstances.

V. The foregoing conclusion finds additional support when the challenged instruction is viewed in another light.

In State v. Estrella, 257 Iowa 462, 472, 133 N.W.2d 97, 103, we pointed out, error in one instruction will not necessarily vitiate a verdict when the jury is otherwise properly instructed.

And in State v. Davis, 244 Iowa 400, 405, 56 N.W.2d 881, this court said: "We have repeatedly held that a particular instruction should be construed in connection with the entire set of instructions submitted. [Authorities cited.] And where the claimed error consists of an attack on a limited portion of an instruction which, if standing alone, might be misleading, it is not sufficient to constitute reversible error. [Authorities cited.]"

1338

In this connection see also State v. Hofer, 238 Iowa 820, 834, 28 N.W.2d 475, and State v. Kenny, 222 Iowa 279, 282, 268 N.W. 505.

We have also held, technical errors which are not unavoidably interwoven with the result reached are not to be deemed prejudicial. State v. Rutledge, 243 Iowa 179, 191, 47 N.W.2d 251, and State v. Neuhart, 228 Iowa 1055, 1061, 292 N.W. 791.

It is self-evident instruction 9 related only to murder in the first degree, and defendant was convicted of murder in the second degree, being a lesser and included offense.

It follows that error, if any, in that portion of the subject instruction pertaining only to an offense of a higher degree than that upon which a guilty verdict was returned, will not alone give to defendant the aid and relief he now seeks.

VI. Defendant also complains because the trial court did not instruct the jury as to the meaning of "inference" or "presumption."

Admittedly words, terms or phrases may be employed in the instructions given to a jury which are so uncommon and unfamiliar to the average person as to require some explanation, clarification or definition.

The court, in the case now before us, might well have defined the terms "inference" and "presumption", but in the light of all the instructions given we see no reversible error in failing to do so. These words may, in the mind of the scholar, involve some fine legalistic distinctions, but to the average person their meaning is neither so veiled nor uncertain as to require a definition. State v. Stout, 247 Iowa 453, 460, 74 N.W.2d 208; State v. McCall, 245 Iowa 991, 995, 63 N.W.2d 874; State v. Williams, 238 Iowa 838, 846, 847, 28 N.W.2d 514; Smith v. Pine, 234 Iowa 256, 264, 12 N.W.2d 236; State v. Reed, 205 Iowa 858, 861, 216 N.W. 759; and 23A C. J. S., Criminal Law, section 1191, page 484.

VII. Finally complaint is asserted because of failure on the part of the trial court to instruct on defendant's right to arm himself.

The general rule regarding right to arm is as follows:

"Where the court restricts the issue of self-defense by submitting the issue of provoking the difficulty, * * *, it should also instruct the jury as to accused's right to arm himself in anticipation of danger, and, where such an instruction is warranted by the evidence, a refusal to give it constitutes error. Such an instruction, however, is neither necessary nor proper where such an issue is not raised by the evidence in the case, as where the evidence shows that, although accused was carrying a weapon at the time, he was doing so merely as was his usual custom, and not in anticipation of danger from deceased; *nor is such an instruction required where the court instructs as to self-defense without any limitation as to provoking the difficulty*." (Emphasis supplied.) 41 C. J. S., Homicide, section 378c(4), pages 177, 178. See also State v. Ebelsheiser, 242 Iowa 49, 58, 59, 43 N.W. 2d 706, 19 A. L. R.2d 865.

It is self-evident the court did not restrict the element of self-defense by submission of any inapplicable issue relative to provoking the difficulty.

A right to arm instruction was neither required nor appropriate under the factual circumstances presented in the case at bar.

VIII. Finding no reversible error the conviction and judgment must be affirmed.—Affirmed.

All JUSTICES concur.