JAMES HEMMINGER, Appellee, v. CITY OF DES MOINES, Appellant.

**MUNICIPAL CORPORATIONS: Torts—Negligence in Executing Plans.**
1   A city may not be said to be negligent in the *adoption* of plans and
specifications for a public improvement when they are the result
of an honest exercise of judgment on the part of competent en-
gineers; but the city may be negligent (and consequently respon-
sible in damages) in *executing* said plans and specifications.   So
held on the issue whether a city was negligent in failing to calk
and cement the joints of a sanitary sewer.

**NEGLIGENCE: Proximate Cause—Possibility of Theory's Being True.**
2   A theory may not be said to be established by circumstantial evi-
dence unless the facts upon which the theory is predicated are of
such a nature and so related to each other that the conclusion
sought to be drawn therefrom is the only conclusion that fairly
and reasonably arises.   Evidence held insufficient to show that the
faulty laying of a sanitary sewer was the proximate cause of the
contamination of a near-by well.

Headnote 1:   28 Cyc. pp. 1313, 1315.   Headnote 2:   23 C. J. p. 49; 28
Cyc. p. 1496.

*Appeal from Polk District Court.*—O. S. FRANKLIN, Judge.

MAY 12, 1925.

ACTION in tort, to recover damages alleged to have been
caused by a defective sewer constructed by the defendant city.
The material facts are stated in the opinion.   A verdict was
returned in favor of plaintiff in the sum of $1,200; and, mo-
tion for new trial having been overruled, judgment was entered.
The defendant appeals.—*Reversed.*

*John J. Halloran, Reson S. Jones, Chauncey A. Weaver,*
and *Paul Hewitt,* for appellant.

*George F. Brooks* and *Harry W. Hanson,* for appellee.

DE GRAFF, J.—This appeal involves the liability for dam-
ages to plaintiff by reason of an alleged faulty construction by

the defendant city of a sanitary sewer past the premises of plaintiff. The particular defect has reference to the manner of connecting the sewer tile joints, which, it is alleged, permitted sewage to escape, thereby contaminating plaintiff's well and causing injuries upon which his damages are predicated. There are two pleaded items of damage. In the first count, plaintiff seeks to recover $500 due to a depreciation of his residence property by reason of the loss of his well; and in the second count, damages in the sum of $3,055 are sought to be recovered by reason of the well contamination, thereby causing a typhoid epidemic in his family, resulting in the loss of wages to himself and minor son, and in money expended for medicine, medical services, nurse hire, and incidental expenses in caring for his children during their sickness.

1. MUNICIPAL CORPORATIONS: torts: negligence in executing plans.

Two basic facts may be accepted as established by the record: (1) That the well on plaintiff's premises was contaminated from some source by typhoid germs, causing it to be condemned; and (2) that certain members of plaintiff's family were seriously affected by typhoid fever in the month of October, 1920, caused by the drinking of water from said well.

Two questions are presented: Does the evidence bearing on the alleged negligence of the defendant city present a jury question? Does the evidence sustain an affirmative finding that the conditions as alleged, and the resulting damages therefrom, were proximately caused by the negligence of the defendant city in the construction of the sewer past the premises of plaintiff?

It appears that, on the 10th day of August, 1917, the defendant city of Des Moines completed the construction of a 10-inch sewer, about 12 feet deep, on West Twenty-third Street, north and south along said street, past the residence property of the plaintiff. It is admitted that the specifications required that oakum which had been dipped in cement should be inserted at all tile joints, and the joints then sealed with cement. In digging the trench for the tile a few feet south of plaintiff's residence, which faced west on Twenty-third Street, an unusually strong underground vein of water was unexpectedly tapped, which caused the stream to flow into the tile ditch; and by reason thereof, the engineers of the city in charge of the

work were compelled to vary the manner and method of connecting the sewer tile for a short distance. One of the engineers testified:

"The digging machine had to be taken away from the ditch, and considerable work done in there for a short distance by hand; and it was rather a difficult piece of work to handle. The sides were sheeted. The sewer was constructed in accordance with the plans and specifications, so far as possible, and particular care was taken in that locality to get as good a sewer there as possible, on account of the water. Particular care was taken, in that there was considerable difficulty in putting the sewer through there. It required more care than usual. There were several things that could be done; and one was to do as they were instructed to do, and the specifications required, for that particular job, and that was to use cheesecloth to wrap around the cement, to keep it from being washed out by the water. The city inspector was to use that cheesecloth, both by instructions of myself and by specifications. There are other methods of taking care of those joints: some of them better, some of them not so good, and some more expensive; but they were not specified on this particular job."

The sanitary engineer testified in connection with the method adopted, as follows:

"All through the place where the water was excessive, we carried out the instructions of the city inspector. I remember buying two or three bolts of cheesecloth, and we put it all in that place, and we cut sod, weeds, and grass and everything to stuff in around, to keep the water from washing the cement out of the joints after it was put in."

The sewer inspector testified:

"When we struck this water, it rushed in on us. We had a hard battle. We used cheesecloth for laying of the pipe, and had to wrap that cheesecloth around it and throw sod around it, to protect the joints as best we could. The cheesecloth was put in there so as to keep the joint as nearly as possible to hold the cement together. By putting the cheesecloth around the joint, we had time enough to get dry clay or sod around it, and that would hold the joint long enough so that the water would not affect the cement. I have been familiar with sewer construction

for 35 years. I ordered the sod, and there was sod in front of the tile and back of the tile; and instead of taking the trowel, we dumped buckets of cement in there; and as soon as the cement was dumped in, we covered it over with sod and dry dirt. That was done on each joint on that particular tile where we struck the vein of water on Twenty-third Street.''

The tile layer, called on behalf of the plaintiff, testified that he observed the underground stream, and that it flowed into the ditch ''just the same as a water main busted. It had an awful bad effect on laying the tile. In cementing, we sometimes use our hand, and sometimes a trowel. When we did not use cement, we used oakum. We put it between the bell and the spigot. The bell end of the tile lay up the line (to the north). There was a little space 15-25-40 feet where tile was laid without calking it or cementing the joints. That was just south of Hemminger's place.''

A former city engineer called on behalf of the plaintiff testified, in answer to a hypothetical question, that the laying of this sewer tile without calking and cementing the joints ''would mean that it was not a proper sewer construction.''

The city inspector said, on cross-examination, that the situation at the time and place in question did not excuse the cementing of these tile joints; but this was not an admission on his part that the joints were not cemented. By reason of the primary question involved in this case, we deem it unnecessary to quote the record further in these particulars.

It is well settled that a municipality acts under its governmental functions in adopting plans and specifications for a sewer system; and if such plans and specifications are the result of an honest exercise of judgment on the part of a competent engineer employed by the city, then the city is not liable for injury resulting from the adoption of such plans, provided that the construction thereunder is not done in a negligent manner. If a nuisance is occasioned by some negligence on the part of the city in the construction or maintenance of a public work, the city is liable on the theory that, when the city itself undertakes to build, construct, or maintain public works, it assumes the performance of a ministerial function, and a failure on its part to exercise reasonable skill and care makes it an-

swerable for injuries proximately caused by such negligence. These questions have been frequently before this court, and well established precedents are recognized in its decisions. *Miller Groc. Co. v. City of Des Moines,* 195 Iowa 1310; *Hines v. City of Nevada,* 150 Iowa 620; *Walters v. City of Marshalltown,* 145 Iowa 457; *Fitzgerald v. Town of Sharon,* 143 Iowa 730; *Vogt v. City of Grinnell,* 133 Iowa 363; *Rand Lbr. Co. v. City of Burlington,* 122 Iowa 203; *Young v. Rothrock,* 121 Iowa 588.

It is not claimed that the engineers of the defendant city were incompetent, nor are the plans and specifications subject to any impeachment. The negligence is predicated on defective construction. It is obvious that a city can act only through the agency of others, and consequently it was the duty of the city to select competent engineers. As said in *Van Pelt v. City of Davenport,* 42 Iowa 308:

"When such selection is made, the city has in that regard discharged its duty, and no direct negligence or omission is attributable to it. * * * If he [engineer] is sufficiently competent, and makes a mistake after the honest exercise of his best judgment, it is such mistake as is inseparable from human action."

In other words, a city is not an insurer, and is not liable unless for negligence in its performance of a duty.

Plaintiff alleges in his petition that:

"Said sewer was negligently constructed, and that the tiles of which it was constructed and which were the means of conducting and retaining the stream of sewage were not calked and sealed with cement, and that the joints thereof were left open in such a way that the sewage and contents of said sewer could and did escape therefrom."

The evidence bearing on this allegation is in some dispute and in sufficient conflict to carry the question to the jury: that is, whether or not the sewer in the particular charged was constructed in a reasonably careful and workmanlike manner.

We now pass to the crucial question in this case: Does the evidence warrant a finding by the jury that plaintiff's well was contaminated by sewage which escaped from the alleged de-

2. NEGLIGENCE:
proximate cause:
possibility of
theory's being
true.

fective tile joints? The verdict must necessarily rest upon circumstantial evidence, but this is no reason for disturbing it. A well connected train of circumstances may be as cogent of the existence of a fact as an array of direct evidence. We therefore inquire: Are the circumstances relied upon by plaintiff of such a nature and so related to each other that the only conclusion that can be fairly or reasonably drawn therefrom is the conclusion indicated by the verdict? It was upon the plaintiff to establish by a fair preponderance of the evidence that the contamination in the water of the well of plaintiff found its source in the sewer seepage which outfiltrated from the alleged defective tile joints. This legal hurdle must be vaulted by the plaintiff, to justify a recovery. Does the evidence present a balancing of probabilities? If it may be concluded from the circumstances surrounding the case that they indicate simply a possibility that the theory of plaintiff is true, then plaintiff has not made out his case. *Peterson v. Dolan,* 186 Iowa 848. A theory may not be said to be established by circumstantial evidence unless the facts upon which the theory is predicated are of such a nature and so related to each other that the conclusion sought to be drawn therefrom is the only conclusion that fairly and reasonably arises.

"It is not sufficient that they be consistent merely with that theory, for that may be true, and yet they may have no tendency to prove the theory. * * * If other conclusions may reasonably be drawn as to the cause of the injury from the facts in evidence than that contended for, the evidence does not support the conclusion sought to be drawn from it." *Neal v. Chicago, R. I. & P. R. Co.,* 129 Iowa 5.

See, also, *Kearney v. Town of DeWitt,* 199 Iowa 530, with cases cited.

What are the circumstances?

That the water of the well in question contained typhoid germs cannot be questioned. Did these disease germs find their source in sewer or *sewage* contamination? Medical authorities quite universally agree that every person who contracts typhoid fever does so because he has recently swallowed some typhoid germs that have passed in the stools or urine of some other per-

son who either (as a patient) was suffering from typhoid or (as a carrier) was carrying the germs without showing symptoms. See Farmers' Bulletin No. 463, U. S. Department of Agriculture, issue of August 22, 1911.

The bacteriologist of the defendant city testified that sewage contamination "comes from any source which is either human or animal in its origin. It always has to be intestinal, to be considered sewage. There is a multitude of different sources from which it may emanate. Typhoid bacteria may be found in surface water, and milk sometimes carries it."

Dr. G. A. Field, called as a witness for the plaintiff, testified:

"We can never tell where the source of contamination is. There is no positive evidence unless we have something definite that we can find. There is such a thing as sewage contamination outside of that which emanates from a sewer. There are many different sources from which a typhoid condition might germinate. The most common source is from polluted water; then comes, perhaps, milk. Polluted water causing disease may come from surface conditions; it may be caused by improperly regulated and cared-for outside toilets. All sewage running in sewers does not carry typhoid germs; and by polluted surface water I do not mean typhoid polluted water. In speaking of the hog pen, you would not get typhoid pollution there unless there were typhoid sources of germ formation."

What possible sources of typhoid contamination does the record disclose? It must be remembered that we are dealing, not with facts bearing directly on the origin of a cause giving rise to the conditions confronting us, but with theories, which must find their support on facts and circumstances offered by the plaintiff and challenged by the defendant.

In the record before us, the survey and plat of the premises of plaintiff shows that the center of plaintiff's well is situated 105.35 feet east of the center of the sewer at its nearest point. The seepage, therefore, would necessarily percolate that distance as a minimum, in reaching the well of the plaintiff. It is not to be inferred from this statement of fact that water carrying disease germs will not travel that distance. It is said in

*Long v. Louisville & N. R. Co.*, 128 Ky. 26 (107 S. W. 203, 13 L. R. A. [N. S.] 1063):

"In most soils it cannot be safely trusted that water will not seep underground seventy feet, especially in the direction the surface slopes."

See, also, *Payne v. Town of Wayland*, 131 Iowa 659; *Haynor v. Excelsior Springs L. P. H. & W. Co.*, 129 Mo. App. 691 (108 S. W. 580); Bulletin No. 24, Public Health Reports, United States Public Health Service, issue of June 15, 1923.

Do the circumstances rebut the theory and contention of the plaintiff that the typhoid germs in plaintiff's well had their origin in defendant's sewer, and, having escaped through defective tile joints, were carried by percolation to the plaintiff's well? The sewer had a grade of 6.45 feet per hundred feet "at a point 100 feet north of a point directly west of the well" in front of plaintiff's premises. This incline is quite pronounced, and is sufficient, as shown by the testimony, to carry the sewage with considerable velocity through the sewer. The testimony conclusively shows that the sewer had never been stopped up; and the sanitary engineer testified that, by reason of "the great amount of water that is coming through the sewer from infiltration with the grade that is there, it is very improbable that any impurities could have come out of that sewer to the well, because of the high pressure of the water coming in there. I would eliminate that source [of germ infection] entirely." It is further shown that infiltration is more common in the operation of a sewer than outfiltration, for the reason that capillary attraction of any water flowing through a tile or sewer tends to draw water that is in the ground toward the sewer.

One other fact is deserving of mention in this regard. It is shown that there were several wells on the premises abutting on Twenty-third Street adjacent and contiguous to plaintiff's premises. Plaintiff testified that there were four wells on the same side of Twenty-third Street as his house was located, "that went dry at or about the time of the completion of this sewer." It is also shown that a near-by spring "went dry" about the same time. The water in plaintiff's well "lowered quite a bit; in fact, it went down until there wasn't but a couple or three

feet of it, in from one to three weeks" after the breaking of the water vein.

The appellant suggests that the question, reduced to its simplest terms, is: Can a sewer drain powerful enough to suctionize all the water out of a sidehill which it passes, send, at the same time, a countercurrent of contamination back up the hill, to the deleterious demoralizing of a well on a crest thereof, and at a distance of more than 100 feet from the drain itself? Plaintiff's testimony does not answer this question. The engineers for the city say that it is contrary to the law of physics. The well itself was about 22 feet deep, and the other wells in the neighborhood were about the same depth. The slope of the land is away from plaintiff's well. True, the elevation of the bottom of the water in the sewer pipe was 1.22 feet higher than the bottom of the well; but this is not a controlling fact. The elevation of the surface of the water in the well was higher than the elevation of the water in the sewer pipe. On December 1, 1921, it is shown that the elevation of the water in the well was 6.38 feet higher than the elevation of the water in the sewer pipe. It is a well recognized physical fact that the height of the water in the well determines the hydraulic pressure of the water at the bottom of the well.

It is further shown that the general flow of the surface water is to the northwest, and it is also shown that the tendency of sewer contents is to follow the steepest grade. An engineer called by the plaintiff was asked if he knew anything that would cause the sewage in a drain pipe to flow in any other direction. He answered:

"It could only do that in case of a pressure. If the sewer head was blocked, and there was head water back of this place that was obstructing, then that could happen; but, if there is a free flow, it would go in the direction of the steepest grade."

The sewer head was not blocked, and, as stated, the sewer drain past the plaintiff's residence had never been impeded. Under the circumstances as testified by the engineer, the tendency would be to infiltration, and not outfiltration.

Were there other possible sources of origin of the typhoid germs shown by the record? There are several outside toilets in closer proximity to the well of plaintiff than the sewer in ques-

tion. The depth of the vaults is not shown, nor how long they had been used, but presumably from the time the residences were erected. The outside toilet on the plaintiff's premises was situated 58½ feet from the center of his well; the toilet on the premises north of plaintiff at its nearest point was 44 feet from the well; and the toilet on the premises south of plaintiff at its nearest point to the center of the well was 77 feet. The engineer's plat also indicates an apparent former location of an outside toilet on plaintiff's premises 43 feet, at the nearest point, from the center of the well. A hog pen was in use on plaintiff's premises, located approximately 50 feet southeast from the well. These were all sources for the transfer of typhoid bacilli, and, under the circumstances, are entitled to be considered as seriously as a cause of the trouble as the assumption that the defective sewer tile connections permitted the escape of disease-bearing germs.

It is not necessary to view this appeal, as does the appellant, as a movement to vindicate the law of gravitation. Sufficient to state that the circumstantial evidence upon which plaintiff relies, fails to carry the burden placed upon him. The jury was not justified in inferring from a mere possibility the existence of a cause upon which plaintiff predicates his action. Wherefore, the judgment entered is—*Reversed.*

FAVILLE, C. J., and STEVENS and VERMILION, JJ., concur.