**STATE of Iowa, Appellee,**

v.

**Jeffrey Linn HALL, Appellant.**

**No. 62176.**

Supreme Court of Iowa.

Sept. 17, 1980.

Rehearing Denied Oct. 9, 1980.

Leo E. Fitzgibbons, Richard J. Meyer and Harold W. White of Fitzgibbons Brothers, Estherville, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff and Joseph H. Beck, Asst. Attys. Gen., and William B. Ridout, Emmet County Atty., for appellee.

LARSON, Justice.

This defendant appeals from a conviction of manslaughter, in violation of section 690.10, The Code 1977. He assigns as error rulings by the trial court (1) in admitting scientific evidence offered by the State and in refusing psychological evidence offered by the defendant; (2) in admitting items of evidence allegedly seized without valid consent or search warrant; (3) in refusing to permit cross-examination of a witness regarding an alleged breach of an agreement with defendant's attorney; and (4) in refusing to dismiss the indictment because of alleged prosecutorial misconduct. We find no merit in defendant's assignments of error and affirm the conviction.

The defendant and Barbara Johnson, the victim, had dated for some time before her death. The State, which charged him with murder, alleged that the defendant had wielded the knife that killed her. The defendant contended he came upon the scene and found Barbara in a pool of blood, and that bloodstains found on his clothing were caused by dragging her body to get help. According to the defendant, a knife, which he was holding when he went to a neighbor's house, had been found by him by the body. The State used an expert witness to show through analysis of the bloodstains and examination of the knife and clothing fibers that the defendant was not a mere passerby but had in fact stabbed the victim.

I. *The State's Expert Testimony.*

Clothing worn by the defendant and victim on the night of the killing, as well as the murder weapon, were analyzed by Herbert MacDonell, a criminalist. He testified that blood patterns on the defendant's clothing could only have been produced by being in the immediate vicinity where blood was spattered at a great velocity, as in a

stabbing or beating, and that it could not have resulted from mere contact with the body. He also testified blood patterns on the defendant's pants were consistent with wiping a bloody knife like the murder weapon. The knife blade had been broken during the attack, and cloth fibers were found on the broken edge, indicating that Barbara had been stabbed with the knife after it was broken. After photographing the knife blade, MacDonell removed fibers from it for testing. He testified certain red fibers were consistent with those of Barbara's blouse; the blue fibers "had similar properties to both garments, but . . . were more similar to those of Jeffrey Hall's corduroys' coarse weave than the tighter weave of Barbara Johnson's." He found "the red fibers . . . physically over the blue fibers, intertwined and physically over them in some locations," indicating that Barbara was stabbed after the knife had come into contact with the defendant's pants.

The defendant assigns the following bases of error as to this testimony: that there was insufficient foundation for MacDonell's expert testimony on the bloodstains; that testimony about the knife and clothing fibers was not admissible because of insufficient chain–of–custody foundation and alleged alteration; and that MacDonell's testimony of the similarity of the blue fibers in the defendant's trousers was irrelevant and prejudicial.

A. *Foundation.* Witness MacDonell is a professor of criminalistics at Elmira College in New York. Under a grant from the Law Enforcement Assistant Agency, he had conducted experiments on the flight characteristics of blood. His study in the area of blood characteristics, as applied to criminal investigation, was described by him:

> [W]e spent two years, myself and an associate, doing just about all we could possibly do with human blood . . . . We subjected blood to various types of impact conditions and velocities, distances falling and spraying, to study basically the pattern produced under known conditions. This gives us a scale of reference like a ruler. We could then use these patterns to compare to a crime scene.

He was in the process of writing a book about the results of his tests, and had conducted seminars on the subject for crime investigators. He has been involved in over two hundred death investigations and has "testified on the geometric interpretation of bloodstain patterns on forty–two different occasions . . . . " While he acknowledged being one of the few people in the nation qualified in this field, he said tests similar to those he performed are now being conducted at the University of California at Berkeley.

Professor MacDonell described the study of blood characteristics as one based primarily on the laws of physics and mathematics, and testified that the properties of blood may be measured and its behavior predicted. He added that "[t]he interpretation of the pattern would depend upon the experience and knowledge of the examiner." The defendant seizes upon this language which, he says, puts this sort of evidence in the same category as voiceprint and polygraph tests, which have largely been held to be inadmissible. He asserts that bloodstain analysis was not a proper subject for opinion evidence because it is "scientific" in nature and lacks the foundational requirement of general acceptance in the scientific community.

We discussed the status of the polygraph's "general scientific acceptance," as well as other indicia of its reliability in *State v. Conner,* 241 N.W.2d 447, 458–59 (Iowa 1976), and concluded that this area of study had not been proven sufficiently reliable for expert testimony, in part because "the breadth, sensitivity and importance of the inference of polygraph evidence demands a higher standard of trustworthiness than is required of other kinds of scientific evidence." *Id.* at 459.

The rule requiring general scientific acceptance as a foundation for scientific evidence had its genesis in the early case of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), in which the court said:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential forces of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* at 1014. The rationale of *Frye*, which also involved the use of polygraph evidence, has since been applied by some courts to determine the admissibility of *all* scientific evidence. *See* McCormick's Handbook of the Law of Evidence § 203, at 488–89 (2d ed. 1972).

However, the *Frye* standard has been frequently criticized. One author has said:

"General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury. . . . If the courts used this approach, instead of repeating a supposed

requirement of "general acceptance" not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.

McCormick, *supra* § 203, at 491. Other writers have rejected the rule on a variety of grounds.[1]

In determining whether to require general scientific acceptance as a separate prerequisite for the admission of scientific evidence, we make these observations. (1) Such a rule imposes a standard for admissibility not required of other areas of expert testimony, McCormick, *supra* § 203, at 488–89. (2) It is inconsistent with modern concepts of evidence, such as embodied in the Federal Rules of Evidence, which provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Similarly, it would be inconsistent with our own decisions which have established that we are "committed to a liberal rule which allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge with respect to the issue in question." *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 11 (Iowa 1977). Neither federal rule 702 nor the accompanying advisory committee's comments draw any distinction between foun-

1. *See, e. g.,* Moenssens, *Polygraph Test Results Meets Standards for Admissibility as Evidence,* in Legal Admission of the Polygraph 14 (N. Ansley ed. 1975); J. Reid & F. Inbau, Truth and Deception, 309, 310 (2d ed. 1977); J. Richardson, Modern Scientific Evidence §§ 2.5, 6.18, 9.2 n.8 (2d ed. 1974); Boyce, *Judicial Recognition of Scientific Evidence in Criminal Cases,* 8 Utah L.Rev. 313, 325 (1964); Decker & Handler, *Voiceprint Identification Evidence,* 26 Am. U.L.Rev. 314, 316 (1977); Greene, *Voiceprint Identification: The Case in Favor of Admissibility,* 13 Am.Crim.L.Rev. 171, 188, 196 (1975); Jones, *Danger ·Voiceprints Ahead,* 11 Am. Crim.L.Rev. 549, 571 (1973); Kaplan, *The Lie Detector: An Analysis of its Place in the Law of Evidence,* 10 Wayne L.Rev. 381, 385 (1964); Strong, *Questions Affecting the Admissibility of Scientific Evidence,* 1970 U.Ill.L.F. 1, 14; Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Deterring Credibility in a Per-*

*jury ·Plagued System,* 26 Hastings L.J. 914, 917 (1975); Trautman, *Logical or Legal Relevancy A Conflict in Theory,* 5 Vand.L.Rev. 385, 395 (1952); Note, *The Emergence of the Polygraph at Trial,* 73 Colum.L.Rev. 1120, 1144 (1973); Note, *People v. Barbara: The Admissibility of Polygraph Test Results in Support of a Motion for New Trial;* 1978 Det.Col.L.Rev. 347, 349-50, 361; Note, *The Polygraph Technique: A Selective Analysis,* 20 Drake L.Rev. 330, 336 (1971); Note, *Evolving Methods of Scientific Proof,* 13 N.Y.L.F. 677, 681–85 (1967); Note, *Pinocchio's New Nose,* 48 N.Y.U. L.Rev. 339, 342 (1973); Comment, *The Evidentiary Value of Spectrograph Voice Identification,* 63 J.Crim.L., Crime & Police Sci., 343, 349 (1972); *but see* Comment, *Frye Standard of "General Acceptance" for Admissibility of Scientific Evidence Rejected in Favor of Balancing Test,* 64 Cornell L.Rev. 875, 885 (1979).

dation requirements for scientific and non–scientific evidence. Moreover, the Supreme Court of Maine, in applying their rule of evidence identical to federal rule 702, held that, if there had been a requirement of general scientific acceptance prior to adoption of its rule, such requirement was abrogated by the rule. *State v. Williams*, 388 A.2d 500, 503–04 (Me.1978); *see United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1972) ("[t]he clear trend in federal court is toward the admission of expert testimony whenever it will aid the trier of fact."). (3) Despite its apparent simplicity, distinguishing "scientific" evidence from other areas of expert testimony is a difficult determination in many instances. McCormick, *supra* § 203, at 490. The instant case illustrates this difficulty of classifying evidence as scientific or non–scientific. The defendant says the study of blood flight characteristics is itself a science. The witness, on the other hand, testified it was based primarily upon physics and mathematics, which impart accuracy and predictability to the study. (4) "Acceptance in the scientific community" is a nebulous concept; as it has been said, "court records are full of the conflicting opinions of doctors, engineers and accountants, to name just a few of the legions of expert witnesses," *United States v. Stifel*, 433 F.2d 431, 438 (6th Cir. 1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971) (neutron activation analysis evidence admitted), and "[i]n testing for admissibility of a particular type of scientific evidence, whatever the scientific 'voting' pattern may be, the courts cannot in any event surrender to scientists responsibility for determining the reliability of that evidence." *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978) (spectographic voice–identification evidence admitted).

■ We believe that the rationale of *Frye* should apply insofar as it bears upon the reliability of the proffered evidence. Accordingly, we do not believe that "general scientific acceptance" is a prerequisite to admission of evidence, scientific or otherwise, if the reliability of the evidence is otherwise established.

■ Although the foundation evidence on reliability submitted here was not overwhelming, the trial court did not abuse its discretion in finding the bloodstain analysis sufficiently reliable to be admissible. Any weaknesses in the analysis could have been, and we presume they were, pointed out by cross–examination, with the ultimate weight of the evidence determined by the jury. *United States v. Stifel*, 433 F.2d at 438.

In the present case, the evidence offered to show the reliability of the bloodstain analysis included: (1) Professor MacDonell's considerable experience and his status as the leading expert in the field; (2) the existence of national training programs; (3) the existence of national and state organizations for experts in the field; (4) the offering of courses on the subject in several major schools; (5) use by police departments throughout the country in their day–to–day operations; (6) the holding of annual seminars; and (7) the existence of specialized publications.

■ Determinations of admissibility of such evidence must necessarily be made on an ad hoc basis, *United States v. Wainwright*, 413 F.2d 796, 802 (10th Cir. 1969), and it would be impossible to establish rules binding in every case. Obviously the complexity of the subject matter will influence the foundational showing of reliability. For example, the foundation for neutron activation analysis, as in *United States v. Stifel*, 433 F.2d at 435–41, or polygraph evidence, as in *State v. Conner*, 241 N.W.2d at 459, would require greater imput from the scientific community than, for example, blow–ups of handwriting exemplars, ballistic comparisons, or tire tracks.

Another consideration for admissibility is the likely effect of the proffered evidence upon the fact–finding process. As we stated in *Conner*,

> the breadth, sensitivity and importance of the inference of polygraph evidence demands a higher standard of trustworthiness than is required of other scientific

evidence . . . . In a field where so much depends on subjective analysis by the machine operator and the outcome of trial may well turn on the polygrapher's opinion, we believe a strong showing of scientific acceptance and evidentiary reliability must be made.

*Id.; see State v. Williams*, 388 A.2d at 501 (polygraph evidence impinges upon jury's duty of assessing witness credibility).

In this case, weighing of the probativeness, materiality, and reliability of this evidence against possible prejudice in its use, supports the trial court's ruling. As compared to such matters as neutron activation analysis, or the "conservation of momentum–vector analysis," *Henkel v. Heri*, 274 N.W.2d 317, 322–23 (Iowa 1979), the study of blood characteristics is relatively uncomplicated. The witness testified that spattered blood on the defendant's clothing was indicative of close proximity to the victim at the time of the stabbing, and not, as defendant claimed, a result of dragging the victim's body, which would have been evidenced by blood smears. Such testimony was also probative as to the defendant's participation in the stabbing, because of the location of the blood spots, which appeared in an arc from the front of the defendant's shirt, over his shoulder to the back of the right leg. Professor MacDonell testified

[t]he mechanism has to be one of being close to a source of spattered blood and receiving those spatters on clothing. The location on the front and back of a shirt and back of the trousers is a result of blood being cast–off or spattered because both mechanisms will allow fine spots of blood to be produced. And in the arc, as I have described it, that is a continuation of a pattern from the front of the shirt over the shoulder and on the back of the right back leg. This is consistent to being close to a source of blood which is in some way transported up into the air as in a beating or knifing or anything physical that would pick blood up and project it up into the air and in an arc. That is the significance of these blood stains to me. There are some transfer patterns present, but blood spots of this size are

not transferred in that manner. They are projected.

Such observations are largely based on common sense, and in fact, lie close to the ken of an average layman. In pointing out this consideration, one court has distinguished comparison analysis of bite–marks from polygraph evidence in this manner:

[T]he trier–of–fact . . . was shown models, photographs, x–rays and dozen of slides of the victim's wounds and defendant's teeth. It could see what we have seen in reviewing the exhibits to determine the admissibility of the evidence. . . . Thus, the basic data on which the experts based their conclusions were verifiable by the court. . . . In short, in admitting the evidence, the court did not have to sacrifice its independence and common sense in evaluating it.

*People v. Marx*, 54 Cal.App.3d 100, 111, 126 Cal.Rptr. 350, 356 (1975). In the instant case, the defendant's clothing was in evidence, and the bloodstains were readily observable. We fail to see any real distinction between this evidence and other areas of expert testimony readily received by courts, including ballistics, fingerprints, and blood types.

■ This evidence need not wait an assessment by the scientific community; the foundation evidence of reliability and the inherent understandability of the evidence itself provided sufficient bases for its admission. Moreover, a trial court has broad discretion on issues of admissibility of such expert evidence. *State v. Paulsen*, 265 N.W.2d 581, 589 (Iowa 1978); *State v. Peterson*, 219 N.W.2d 665, 673 (Iowa 1974). We conclude that the trial court did not abuse its discretion in admitting the bloodstain analysis evidence.

B. *Alteration.* The defendant claims that the removal of cloth fibers from the knife edge for microscopic examination by Professor MacDonell "prevented Jeffrey from having an evaluation by an independent laboratory" concerning the relative position of the fibers, and his only adequate remedy would be the exclusion of that evi-

dence. He also argues that this evidence should be excluded because the State did not sufficiently negate the possibility that the fibers became attached to the knife while it was in police custody. This possibility is supported by holes in the sacks in which the items were kept and by the fact that the items were transported in the same container.

Before physical evidence may be presented at trial, it must be identified as relating to the instant case. Part of the showing required is that it is "reasonably probable . . . alteration of evidence did not occur." *State v. Bakker*, 262 N.W.2d 538, 543 (Iowa 1978). Such alteration could either destroy the probative value of the object or result in manufactured evidence. The "[t]rial judge determines the sufficiency of physical evidence identification in light of the article's nature, circumstances surrounding its custody and the likelihood of intermeddlers tampering with it." *Id.* Once the trial court has determined that the identification is sufficient, "[c]ontrary speculation effects the weight of the evidence but not its admissibility." *State v. Lunsford*, 204 N.W.2d 613, 617 (Iowa 1973). A determination that the showing is sufficient will only be overturned for a clear abuse of discretion. *Id.* Professor MacDonell's removal of the fibers was necessary for testing. Without such testing the probative value of the presence of red and blue fibers on the broken edge of the knife would have been greatly reduced. We conclude that such a minute alteration of evidence necessary for analysis, which neither destroys it nor diminishes its probative value, does not render it inadmissible.

The defendant's second argument is not supported by the record. While the existence of holes in the evidence bags at trial leads to speculation about when the fibers got on the knife blade, Professor MacDonell testified that there were no such holes in the bags before he examined the evidence. With such a record, we cannot say the trial court abused its discretion in finding the identification sufficient.

C. *The fiber evidence.* The defendant argues that the evidence the blue fiber was similar to the fibers of the pants he was wearing should have been excluded (1) because it was nonprobative and (2) even if it were probative, its value was outweighed by its prejudicial effect. The defendant's claim that the fiber evidence was nonprobative rests on the fact that thousands of pairs of jeans have been made from the same cloth. Thus, he argues that the evidence does not distinguish him from the owners of those other jeans. He relies upon *State v. Peterson*, 219 N.W.2d 665, 669–70 (Iowa 1974), where we held that constitutionally infirm evidence of the defendant's blood type introduced in the State's case–in–chief could not be habilitated under a theory of anticipatory impeachment. Dictum in that case indicated that blood type evidence was nonprobative of the murderer's identity because of the large proportion of the population who share the blood type. We have recently limited that dictum, recognizing the relevance of such evidence. *State v. Mark*, 286 N.W.2d 396, 412–13 (Iowa 1979). The fiber evidence was probative of the fact that the defendant used the knife because the inference is more likely with this evidence than without it. *See State v. Sheffey*, 250 N.W.2d 51, 55 (Iowa 1977).

The defendant's second contention relies on a principle of our common law which we have recognized as the same as Fed.R.Evid. 403. *State v. Harmon*, 238 N.W.2d 139, 144–45 (Iowa 1976). The federal rule provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In asserting this as a basis for exclusion of the fiber evidence, the defendant misperceives the meaning of the term "unfair prejudice" in this context: "[u]nfair prejudice within [the rule's] context means an undue tendency to support decision on an

improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403, Advisory Committee's Note; *accord, State v. Harmon*, 238 N.W.2d at 145 (evidence prejudicial where "its admission would have a wrongful effect on the jury because of the baggage it brings with it, . . . ."). While this evidence was prejudicial to the defense in the sense that it supported a finding of guilt, it was not prejudicial in the sense used in the rule.

## II. *Psychological Testimony.*

A defense psychologist testified extensively about the defendant's psychological tendencies. He testified the defendant would never outwardly express anger or be aggressive and that he was not explosive, impulsive or prone to anger. However, the trial court would not allow him to answer the following question: "Do you have an opinion based on reasonable psychological and medical certainty as to whether or not Jeffrey Hall was capable of committing a homicide?" The trial court allowed the general testimony but declined to allow this specific opinion as "going directly into the very question that the jury must decide, and a question that broad would be beyond what I believe an expert may testify to."

In *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 5 N.W.2d 646 (1942), this court broke new ground in the acceptance of opinion testimony, but it also established limitations for its use:

> Of course, we are not to be understood as saying that opinion testimony should be received as to all matters. It should be received only as to such matters as are the proper subjects of opinion testimony. No witness should be permitted to give his opinion directly that a person is guilty or innocent, or is criminally responsible or irresponsible, or that a person was negligent or not negligent, or that he had capacity to execute a will, or deed, or like instrument, or, . . . respecting whether a county attorney had probable cause to believe the plaintiff was guilty of the crime charged. But the reason is that such matters are not subjects of opinion testimony. They are mixed questions of law and fact. When a standard, or a measure, or a capacity has been fixed by law, no witness, whether expert or nonexpert, nor however qualified, is permitted to express an opinion as to whether or not the person or the conduct in question measures up to that standard. On that question the court must instruct the jury as to the law, and the jury must draw its own conclusion from the evidence. However, courts have permitted both scientific and practical experts to express their opinion whether a certain method used, or course of conduct, was a proper one.

*Accord, State v. Jiles*, 258 Iowa 1324, 1331, 142 N.W.2d 451, 455 (1966). The trouble with the question here is in determining the subject matter of the inquiry. If the defendant's attorney, by asking the psychologist whether the defendant was "capable" of committing the crime based on "reasonable psychological and medical certainty," was seeking evidence of insanity or diminished capacity, that purpose was not made apparent. In the form in which it was asked, "capability" could, in fact, have many meanings, legal as well as physical or psychological. Thus, as the trial judge pointed out, there was no showing the question was within the witness' qualification to answer.

 As we have already noted, the trial court is vested with broad discretion in ruling on such matters, and we will not reverse in the absence of clear evidence of abuse. While it would perhaps have been more consistent with the trial court's ruling on blood analysis evidence, as discussed in Division I, to have admitted this evidence, we do not believe the trial court abused its discretion in sustaining the objection to the question in its proffered form.

## III. *Seizure of Items.*

A. *The consent to search.* On the evening of the defendant's arrest, he was taken to the police station for questioning. He was asked for consent to remove his bloody clothing and for withdrawal of body specimens. His consent was given and he signed

a consent form. He now contends the consent was invalid because it was not voluntary.

■ The rules for appellate examination of this issue are well settled in our cases. Review of a voluntariness issue requires examination of the totality of the circumstances. *State v. Jacoby*, 260 N.W.2d 828, 832 (Iowa 1977); *State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975). This court's scope of review is de novo. *State v. Folkens*, 281 N.W.2d 1, 3 (Iowa 1979). The burden of proof is on the State to show the validity of the consent by a preponderance of evidence. *Id.*

■ With these principles in mind, we address the issue of voluntariness, first on the defendant's claim of extreme emotional distress. There was some evidence the defendant was "upset" while at the police station, one doctor testifying that he "wouldn't be in any condition to make any decision on his own at that point." However, there was also evidence that the defendant was relatively calm and that he was quietly seated between his parents when the consent form was signed. His father signed the form as a witness. We have held that emotional distress must be shown to have been so severe that it impaired capacity for self–determination or made the consent involuntary. *See State v. Jacoby*, 260 N.W.2d at 833 (emotional state insufficient to vitiate waiver of *Miranda* rights); *State v. Hansen*, 225 N.W.2d 243, 349–50 (Iowa 1975). We have examined the entire record on the claim that he was under such severe emotional distress that his consent was not voluntary. We conclude it does not, standing alone, support the claim, but consider it as part of the totality of circumstances, together with the following complaints, on the voluntariness issue.

■ The defendant also claims trickery was used to obtain his consent because one of the officers, when asked by the defendant whether the victim was dead, replied that he "didn't know." The agent did in fact know she was dead. It is true that

devious activity by authorities is "one of the circumstances relevant to the issue of voluntariness . . . ." *State v. Cullison*, 227 N.W.2d 121, 128 (Iowa 1975). This issue was raised in *State v. Cooper*, 217 N.W.2d 589 (Iowa 1974), where the defendant claimed waiver of his *Miranda* rights was thereby rendered invalid. We said in that case that

[d]eception of any nature by representatives of the state cannot be condoned. However, we conclude deception standing alone does not render a waiver of constitutional rights involuntary as a matter of law unless the deceiving acts amount to a deprivation of due process. Nevertheless, deception becomes a factor to be considered in reviewing the totality of the circumstances in making the determination as to the voluntariness of the waiver even though the act does not per se produce exclusion.

*Id.* at 597. *Accord, State v. Jacoby*, 260 N.W.2d at 832–33 (deception as to death of victim; considered in totality of circumstances and held insufficient to vitiate waiver). We conclude that this deception did in fact occur, but we consider it only as part of the totality of circumstances in determining voluntariness; it is insufficient alone to vitiate the consent.

■ B. *Alleged violation of agreement.* The defendant also claims that, following his arrest and before the consent was signed, his lawyer and the prosecuting attorney had reached an agreement on the telephone that the authorities would not talk to him any more unless his lawyer was present. The consent, he claims, was obtained from him in violation of that agreement. He urges us to rule this alleged breach vitiated the consent and rendered the items seized inadmissible on the ground it violated our Code of Professional Responsibility DR7–104(A)(1):

During the course of his representation of his client a lawyer shall not:

(1) Communicate . . . on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior

consent of the lawyer representing such other party or is authorized to do so. We believe such a violation, assuming it occurred, is akin to deception and would not require exclusion of the evidence unless it amounted to a deprivation of constitutional rights in itself or, as part of the totality of the circumstances, rendered the consent involuntary. *See State v. Jacoby*, 260 N.W.2d at 833.

The evidence was conflicting on the content of the conversation, although it is undisputed that the defendant's attorney was reached by telephone at his lake home twenty miles from Estherville, at approximately 12:15 a.m. He decided not to drive to Estherville, but talked to the county attorney and to one of the officers. The defendant contends the agreement was that the officers were to have no further *contact* with him after their telephone conference with his attorney. His evidence shows the agreement was that the officers would not *talk* to him. The State's testimony was that, under the agreement, they were not to *interrogate* him further. There is no claim that the defendant was interrogated after the call. We do not believe the evidence supports the claim that the authorities were to have no further *contact* with the defendant; obviously they would have to have contact with him if for no other purpose than to complete his release from custody as requested by his parents and his attorney. There is evidence, however, that the officers were not to *talk* to him in the absence of his attorney. We assume for purposes of resolving this issue that the securing of this consent did in fact violate the letter of that agreement, because obviously the authorities would have to "talk" to him to get it. We have never expressly ruled on this issue, but we have held in analogous cases that a defendant's waiver of his *Miranda* rights is effective even though made in the absence of an attorney known to represent him. *See State v. Iowa District Court*, 236 N.W.2d 54, 55 (Iowa 1975); *State v. Allen*, 224 N.W.2d 237, 239 (Iowa 1974); *State v. Winfrey*, 221 N.W.2d 269, 273 (Iowa 1974). *See also Coughlan v. United States*, 391 F.2d 371, 372 (9th Cir. 1968).

While we would not condone a breach of such an agreement, we are not persuaded that anything more than differing interpretations of the agreement occurred here. Whether a request for consent, while admittedly done by "talking" to defendant, constitutes such a breach is open to speculation. The defendant does not allege a sixth-amendment violation, such as addressed in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (violation of agreement not to interrogate), nor would the effective–counsel protections of the sixth amendment appear to be applicable because, when the agreement was made, no adversary criminal proceedings had been initiated, *see Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417 (1972). Rather, the defendant asks that we fashion an exclusionary rule based only upon violations of the ethical standard in DR7–104(A)(1). While we view violations of these standards as serious matters, they fall short of constitutional dimensions and, like the court in *Coughlan*, we are reluctant to expand the concept of *Miranda* to these circumstances. *Coughlan v. United States*, 391 F.2d at 372. We do, however, consider the allegation of breach of the agreement as being akin to allegations of deception, and therefore consider it as a part of the totality of circumstances.

■ Upon our review of the totality of circumstances, including the defendant's emotional state and the allegations of deception as to the condition of the victim, and the alleged breach of the attorney's agreement, we conclude that the State has established the voluntariness of the consent by a preponderance of the evidence and that the evidence seized was properly admitted into evidence.

■ C. *Legality of the search warrant.* The defendant contends that a warrant issued for the search of his car was invalid because it was preceded by a warrantless search and was based upon the fruits of that search. If established, this would vitiate the legality of a warrant. *State v.*

*Folkens,* 281 N.W.2d 1, 2–3 (Iowa 1979). Because we have concluded the consent for the search of the car was valid, we need not reach the issue. Nevertheless, we have examined the record upon which the defendant relies. He contends that letters between the defendant and the victim were sought in the warrant application and that the officers' knowledge of their existence could have been obtained only by a prior search. There is insufficient evidence to support that inference. The ambulance driver testified only that he saw "someone" looking in the car as it was parked at the scene of the crime; it was dark and he could not say who was in the car or what they did, nor did he see anybody looking in the trunk. The defendant also relies on a handprint on the trunk of the car which, he assumes, must have been left by the police after the pre–warrant search. The officers denied a pre–warrant search was made. Upon our de novo review, we find that there was no pre–warrant search which would vitiate its legality.

### IV. *Scope of Cross–Examination.*

■ The defendant attempted to cross–examine one of the investigating officers concerning the agreement with his attorney and the alleged breach of it. We have already concluded that the breach of that agreement, if it occurred, was only a part of the totality of circumstances. As such it was a matter for the court, not the jury. The defendant argues, however, that the trial court should have allowed him to cross–examine the officer about the alleged breach of the agreement to establish a lack of the witness's credibility. The basis for this contention is Fed.R.Evid. 608 which provides in part:

> Specific instances of the conduct of a witness . . . may . . . , in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross–examination of the witness . . . concerning character for truthfulness or untruthfulness . . . .

■ However, it was not shown that this agent was untruthful in regard to his version of the agreement; his version merely differed from that of the defendant's attorney. Moreover, under rule 608 itself, it may be allowed "in the discretion of the court." We have similarly stated that the extent and scope of cross–examination is vested in the trial court's discretion. *State v. Sheffey,* 250 N.W.2d 51, 55 (Iowa 1977). We do not believe the trial court abused that discretion here.

### V. *Prosecutorial Misconduct.*

■ The defendant contends he is entitled to dismissal of the charges because of alleged misconduct of the prosecuting attorneys. The first of the specific complaints is that two prosecuting attorneys "contacted" one of the members of the jury panel named Condon before selection of the jury and that they discussed, in his presence, an unrelated murder case in which a defendant had "beaten the system." The two attorneys, under their version of the incident, were discussing the other case at a pizza and beer establishment owned by Condon, and Condon accidently overheard them. When Condon sat down beside them, the conversion stopped, according to the attorneys. The defendant does not dispute this evidence but he contends that Condon, as a member of the jury panel, was in a position to influence the jurors who actually deliberated on the case. He does not claim this actually happened, only that it might have. The jury records show that Condon was successfully challenged for cause, presumably on this ground, and did not actually sit as a juror. The record fails to support the claim that Condon was "contacted" by the prosecuting attorneys or that the conversation overheard by him was in any manner prejudicial to him.

The other incidents of misconduct concern the failure of the State to provide exculpatory evidence and the identity of the blood expert, Professor MacDonell. The alleged exculpatory evidence consisted of a statement by the victim's brother immediately after the killing that another brother

must have killed her and evidence that another car had been seen in the area of the victim's home at about the time she was stabbed. There had been a police report prepared about the brother's statement but the report was not furnished to the defendant until the second week of trial. The information concerning the other car was made available approximately two weeks before trial. The identity of the State's "blood expert" was made several months before the trial, and the defendant took his deposition.

 We have held that dismissal is not an appropriate remedy for failure to provide exculpatory evidence. *State v. Hillsman*, 281 N.W.2d 114, 117 (Iowa 1979). Further we have held that not all material in an investigative file is *"Brady"* material which must be disclosed upon request. As we said in *State v. Hall*, 249 N.W.2d 843, 846 (Iowa 1977), evidence suppressed, to constitute deprivation of due process, "must be material either to the guilt or punishment of the defendant, not merely potentially helpful to the defense." Evidence of a spontaneous statement by the victim's brother, without any investigation on his part, that someone other than the defendant might have killed his sister, and evidence that there might have been another car in the area at the time, would have very limited probative value, if any.

Most important, the evidence allegedly withheld was furnished at or prior to trial, and we have held this to be a sufficient compliance with due process. *State v. Folkens*, 281 N.W.2d at 7; *State v. Epperson*, 264 N.W.2d 753, 756 (Iowa 1978). We further note that the defendant does not claim to have requested a continuance to meet the new evidence, and no request appears in the record.

We find no reversible error on any of the grounds urged and therefore affirm the trial court.

AFFIRMED.

All Justices concur except McCORMICK and UHLENHOPP, JJ., who concur specially, LeGRAND, J., who dissents, and SCHULTZ, J., who takes no part.

McCORMICK, Justice (concurring specially).

I concur in the result and in all but division IIA of the court's opinion.

I am unable to agree that scientific evidence cannot sufficiently be identified, that admissibility of scientific evidence should be determined on an ad hoc basis, that reliability of a novel scientific technique can be established solely on the basis of the success of its leading proponent in peddling his wares to consumers, that the general acceptance standard is inconsistent with the Federal Rules of Evidence, or that the inference sought to be established in the present case was not of great breadth, sensitivity and importance. However, I concur in the result because I am willing to take judicial notice that the principles of physics upon which the blood spatter analysis depended in the present case are well enough established to be subject to judicial notice. *Cf. Stupka v. Scheidel*, 244 Iowa 442, 449, 56 N.W.2d 874, 878 (1953) (judicial notice taken of effects of weather on wood); *Hemminger v. City of Des Moines*, 199 Iowa 1302, 1310, 203 N.W. 822, 825 (1925) (judicial notice taken of effects of hydraulic pressure).

The anomaly in this case is that Professor MacDonell's government-financed experiments are credited with demonstrating the necessity for exercising extreme caution in evaluating expert opinion based on blood spatter analysis:

Extensive research has recently been conducted in this area by the noted expert Herbert L. MacDonell.... The results of the experiments were published in late 1971 and suggest that it is sometimes possible to reconstruct events which must have occurred to produce certain bloodstains. The report with accompanying illustrations demonstrate, however, that many of the conclusions drawn from blood spots which have been suggested by others do not stand the test of experimental verification.... *Extreme caution would seem to be required in evaluating expert opinion on the subject.*

(emphasis added). A. Moessens and F. Inbau, *Scientific Evidence in Criminal Cases* § 6.12(2) at 303 (2d ed. 1978).

I believe the governing principle is that a challenge to admissibility raising the reliability issue puts the burden on the proponent of the evidence to demonstrate that the state of the art or scientific knowledge permits a reasonable opinion to be asserted by an expert. *See* C. McCormick, Handbook of the Law of Evidence § 13 at 31 (2d ed. 1972).

I agree that the trial court did not abuse its discretion in receiving the evidence under this principle in the facts of this case.

UHLENHOPP, J., joins this special concurrence.

LeGRAND, Justice (dissenting).

I believe the admission of blood dynamics evidence was subject to the infirmities listed in Justice McCormick's special concurrence, but I am unable to agree that the error is cured by taking judicial notice of "certain principles of physics."

I therefore dissent from the result reached by the majority.